**UNITED STATES of America, Plaintiff-Appellee,**

v.

**162.20 ACRES OF LAND, MORE OR LESS, SITUATED IN CLAY COUNTY, STATE OF MISSISSIPPI, and F. E. Uithoven et al., Defendants-Appellants.**

No. 80–3707.

United States Court of Appeals, Fifth Circuit. Unit A

March 13, 1981.

Rehearing and Rehearing En Banc Denied April 15, 1981.

Thomas R. Trout, New Albany, Miss., A. Rufus Ward, West Point, Miss., J. Arthur Smith, III, Baton Rouge, La., for defendants-appellants.

H. M. Ray, U. S. Atty., Oxford, Miss., Jacques B. Gelin, James W. Moorman, Anne S. Almy, Ann P. Gailis, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GOLDBERG, GARZA and TATE, Circuit Judges.

GARZA, Circuit Judge:

We are squarely confronted with an issue of law which this court has never addressed: is alleged noncompliance by federal authorities with the mandate of Section 470f of the National Historic Preservation Act of 1966, [NHPA], 16 U.S.C. § 470 *et seq.*, a legally sufficient defense to the condemnation of private property for use in a federal project under the Declaration of Taking Act, [DOTA], 40 U.S.C. § 258a? Our answer depends upon a resolution of the tension between the vast discretionary condemnation power given the government under DOTA, and the pervasive reach of the NHPA's command that mitigation of adverse effect on the tangible evidences of our historic heritage be considered in the decision-making process surrounding federal projects.

I.

Condemnation cases usually revolve around a conflict between private and public purposes. Here, we deal with an enormous federal undertaking, the Tennessee-Tombigbee Waterway Project, and property owned by the Uithoven family [1] which the government has sought to include within a peripheral scheme to enhance the Columbus Lock and Dam segment of the project with recreational facilities.

The Uithoven property is located near the Tombigbee River in Clay County, Mississippi, and is within the area once occupied by the abandoned riverfront town of Barton, (ca. 1848–1870). Upon the tract sits a four-room, one-story nineteenth century dwelling known as Cedar Oaks. The U. S. Army Corps of Engineers seeks to incorporate this property into a "Barton Ferry Recreation Area" which would cover two other extinct riverfront townsites: Colbert, (ca. 1830–1847), and Vinton, (ca. 1849–1900?). The Barton townsite and Cedar Oaks are listed on the National Register of Historic Places as within the Tombigbee River Multi-Resource District, a "zone" created for the purpose of listing historic sites in the project area.

The Uithovens were given notice in 1977 that the Corps intended to acquire their property for use in the Barton Ferry grounds. They submitted an "Application to Exclude Property from Condemnation Proceeding" to the Attorney General of the United States. The application explained that the Uithovens operated the land as a tree farm, and that their crop was ready for harvest. It further stated that the family had established campsites and permitted church and youth groups to camp on the grounds without charge. The application concluded:

Such exclusion would not affect the construction of the project. Such exclusion would allow two gentlemen in their sixties to continue development of the property at their own expense for public recreation, timber production and residence on the family property. The lands and homes have much meaning and inestimable value to the Uithovens. This Historic Site should not be destroyed when the Congressional Policy is the preservation od [sic] such Historic Sites.

This plea apparently reached unreceptive ears, for on February 14, 1978, the United States filed a complaint and declaration of taking in the district court below, together with a deposit of estimated just compensation covering the land. The court signed a judgment of the declaration of taking ten days later.

On April 6th and 14th, the Uithovens filed answers which raised four defenses to the taking: (1) that the complaint did not state a cause of action; (2) that it did not contain a short and plain statement of the use for which the property was taken; (3) that there was no public necessity for the taking; and (4) that the government had failed to comply with provisions of the NHPA. The government moved to strike these defenses and, after oral argument, the district court granted the motion. With regard to the last defense, the court stated:

1. Several persons were discovered to have leasehold interests, and were joined in the suit.

The government does not contend that the Corps of engineers is not required to comply with The Act. As a matter of fact, the government claims that the Corps is now in compliance therewith. The government does contend, however, that it is not required to comply with the Act before it can exercise the right of eminent domain in the action sub judice. This argument appeals to the court.

Final judgment upon a stipulated just compensation was entered, and this appeal was taken.[2]

## II.

The Uithovens urge us to hold that the district court erred in striking the NHPA-compliance defense as legally immaterial. The government responds with the assertion that its condemnation power may be exercised either before or after compliance with the NHPA, and goes on to argue that it was in compliance with the act when the declaration of taking was filed in this case.

Our analysis must begin with an examination of NHPA, which is less familiar to federal courts than the venerable DOTA. The act has been called an attempt to provide "new scope and techniques for federal efforts to preserve cultural resources," enacted "[T]o meet the shortcomings of previous federal legislation and to help stem the loss of irreplaceable cultural resources." J. M. Fowler, *Federal Historic Preservation Law: National Historic Preservation Act, Executive Order 11593, and Other Recent Developments in Federal Law*, 12 Wake Forest L.Rev. 31 (1976). The preamble declares the values to be promoted:

The Congress finds and declares . . . that the historical and cultural foundations of

the nations should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People. 16 U.S.C. § 470.

Section 470f of the act creates a mechanism to promote these values neither by forbidding the destruction of historic sites nor by commanding their preservation, but instead by ordering the government to take into account the effect any federal undertaking might have on them, the National Register of Historic Places serving as the list of sites. This portion of the act provides as follows:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking.

The government describes this provision as an effort "to insure consideration of preservationist values by federal agencies . . ." While the act may seem to be no more than a "command to consider," it must be noted that the language is mandatory and the scope is broad.[3]

---

**2.** Following the judgment, the Corps allowed F. E. Uithoven to continue living on the property, and allowed two other family members to make periodic visits. This policy came to an end when the Corps asked the Uithovens to completely vacate the property, terminating any right to co-possession. The district court granted a motion to extend co-possession until September 1, 1980, but denied another extension motion on September 2nd. We granted the Uithovens' subsequent request for a stay pending the disposition of this appeal.

**3.** As one might gather from a reading of section 470f, the compliance procedure is complex, and will necessarily vary from situation to situation. Executive Order No. 11593, issued on May 13, 1971, and published in full immediately following 16 U.S.C.A. § 470, provides some detail. An exhaustive description of the requisite procedures can be found in Fowler, *Federal Historic Preservation Law, supra*. We will have no occasion to discuss them in the context of this case.

The government admits both the applicability of the act and the necessity of the Corps' compliance; it disputes, however, any assertion that a failure to comply before the institution of condemnation proceedings under DOTA will afford a defense to the defendant-owner. In order to evaluate NHPA as a potential defense, we must examine certain provisions of DOTA and cases delineating their legal effect.

40 U.S.C. § 258a sets out the procedure to be used in taking private land for federal purposes:

> In any proceeding in any court of the United States outside of the District of Columbia . . . instituted by and in the name of and under the authority of the United States for the acquisition of any land or easement or right of way in land for the public use, the petitioner may file in the cause . . . a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition, declaring that said lands are thereby taken for the use of the United States.

It is the consequence in law of such a filing which has particular relevance here. Section 258a continues:

> Upon the filing said declaration of taking and of deposit [of estimated just compensation] . . . title shall vest in the United States and said land shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation . . . shall vest in the persons entitled thereto.

█ The government has cited a number of decisions discussing the effect of the last-quoted provision, and we are compelled to agree with the position which they cumulatively state. In a condemnation proceeding under Section 258a where the government is not already in possession of the property, the filing of a declaration of taking and deposit of estimated compensation vests title in the United States, accomplishing the taking. *See Best v. Humbolt Mining Co.*, 371 U.S. 334, 340, 83 S.Ct. 379, 9 L.Ed.2d 350, 355 (1963); *United States v. Dow*, 357 U.S. 17, 23, 78 S.Ct. 1039, 1045, 2 L.Ed.2d 1109, 1115 (1958); *Fulcher v. United States*, 604 F.2d 295, 296 (4 Cir. 1979); *United States v. 2,997.06 Acres of Land, More or Less, In Marion County, State of Florida*, 471 F.2d 320, 337 (5 Cir. 1972); *Likins-Foster Honolulu Corp. v. Commissioner*, 417 F.2d 285, 289 (10 Cir. 1969); *Covered Wagon, Inc. v. Commissioner*, 369 F.2d 629, 633 (8 Cir. 1966); *Certain Land in City of Washington, D. C. v. United States*, 355 F.2d 825, 826 (D.C.Cir.1965). The district court, powerless to dismiss the proceedings, performs an almost ministerial function in decreeing the transfer of title. *See United States v. Cobb*, 328 F.2d 115, 116 (9 Cir. 1964); *United States v. 2,974 Acres, Clarendon County, South Carolina*, 308 F.2d 641, 643 (4 Cir. 1962); *United States v. Hayes*, 172 F.2d 677, 679 (9 Cir. 1949); *United States v. Carey*, 143 F.2d 445, 450 (9 Cir. 1945).

█ The sole defense which may be raised against the condemnation itself is that of lack of authority to take in the petitioner. In *Dow, supra*, the Supreme Court noted that "[T]he Taking Act does not bestow independant authority to condemn lands for public use. On the contrary, it provides a proceeding 'ancillary or incidental to suits brought under other statutes.'" 357 U.S. 17 at 23, 78 S.Ct. 1039 at 1045, 2 L.Ed.2d 1109 at 1115. It is clear that a condemnee may challenge "the validity of the taking for departure from the statutory limits." *Catlin v. United States*, 324 U.S. 229, 240, 65 S.Ct. 631, 637, 89 L.Ed. 911, 919 (1944); *See also Berman v. Parker*, 348 U.S. 26, 35, 75 S.Ct. 98, 103, 99 L.Ed. 27, 39 (1954); *Maiatico v. United States*, 302 F.2d 880, 886 (D.C.Cir.1962). A perusal of cases involving assertions of the defense of lack of authority reveals that federal courts do not second-guess governmental agencies on issues of necessity and expediency when condemnation is sought; such matters are within the discretion of the legislature or of administrative bodies by delegation, and the concept of justiciability limits judicial review to the bare issue of whether the limits of authority were exceeded. *See generally Berman, supra; United States v. 2,606.84*

*Acres of Land in Tarrant County, Texas,* 432 F.2d 1286 (5 Cir. 1970), *cert. denied* 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971); *O'Brien v. United States,* 392 F.2d 949 (5 Cir. 1968); *Swan Lake Hunting Club v. United States,* 381 F.2d 238 (5 Cir. 1967); *2,953.15 Acres of Land, More or Less, in Russell County, State of Alabama v. United States,* 350 F.2d 356 (5 Cir. 1965).

When section 470f is considered as a potential defense to a DOTA condemnation against this background, we think it apparent that the Uithoven's argument must fail.[4] The filing of a declaration, by which title vests, is a neutral act vis-a-vis NHPA compliance procedures and the policy concerns behind them. Federal agencies are compelled to abide by the terms of the NHPA regardless of the public or private character of the property involved. Further, where it has been long established that the role of the district court in DOTA condemnations is limited to a bare consideration of the legal authority to take, and where the courts have been careful to refrain from considering matters of propriety, expediency and policy with regard to the use of the property sought, we conclude that only an express statement by Congress that NHPA noncompliance is a defense to a

condemnation itself would be sufficient to achieve that result. While it may seem that the asserted defense would promote the purposes of the NHPA by creating a means of enforcement to give it "teeth," it is manifestly apparent that only Congress can make such a judgment.[5]

### III.

Our holding does not, however, imply that section 470f is a serpent without fangs as to federal planners bent on disregard of its mandate, and we have not completely resolved this litigation against the Uithovens. The government acknowledges in its brief that "judicial intervention is appropriate to vindicate the purposes of the National Historic Preservation Act." It notes the DOTA provision that "the Court shall have power to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the petitioner," 40 U.S.C. § 258a, and admits that "[A]ccordingly, while a court is without power to stay the passage of title, it may withhold physical possession and enjoin construction or any activity that may disturb the environment, cultural or physical, pending compliance with [the] congressional mandate." *See, e.*

---

4. The district court cited two opinions issued by district courts, one which supports the Uithoven's position and one which rejects it. In *United States v. 4.18 Acres of Land,* Civil No. 3–74–33 (D.Idaho February 20, 1975), Judge J. Blaine Anderson ruled that where the United States Forest Service had not complied with section 470f procedures prior to the institution of a condemnation suit, the action was premature. In *United States ex rel. TVA v. Three Tracts of Land,* 415 F.Supp. 586 (E.D.Tenn. 1976), the district court dealt with the precise argument advanced by the Uithovens, ruling as follows:

> Executive Order No. 11593 and 16 U.S.C. § 470(f) impose specific obligations on the heads of federal agencies with respect to sites, structures or objects which have been listed or may become eligible for listing in the National Register of Historic Places. Neither can be construed as limiting a federal agency's authority to acquire property through condemnation. The duties created in the statute and the executive order arise once a federal agency obtains ownership or control of property. Since condemnation is a common means used to acquire ownership or

control of property, it seems clear that neither the statute nor the executive order were intended by Congress or the President to operate as a defense in a condemnation proceeding. *See Order of Friars v. Denver Urban Renewal Authority,* 186 Colo. 367, 527 P.2d 804 (1974). 415 F.Supp. at 588.

Our decision in this case indicates agreement with the latter opinion.

5. Our conclusion is bolstered by an analogous line of cases dealing with the effect of section 102(2)(C) of the National Environmental Protection Act, [NEPA], 42 U.S.C. § 4332(2)(C), which requires federal agencies to prepare environmental impact statements on "major federal actions significantly affecting the quality of the human environment." This provision has been held irrelevant to the validity of a condemnation under section 258a. *See United States v. 178.15 Acres of Land, More or Less, Grayson County Virginia,* 543 F.2d 1391 (4 Cir. 1976); *United States, TVA v. Three Tracts of Land, Etc., Alabama,* 377 F.Supp. 631, 637 (N.D.Ala.1974).

g., *United States v. 247.37 Acres in Clermont County, Ohio*, 3 ERC 1098 (S.D.Ohio 1971). It is also argued that a condemnee might alternatively file a separate suit to enjoin a project until the NHPA has been complied with. *See, e. g., Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975).

We agree that a district court having before it a condemnation case may, pursuant to the power granted under the DOTA provision quoted above, require compliance with section 470f and either withhold possession by the government or take appropriate injunctive action to enforce its order. The transfer of title is an environmentally neutral action which, as we have observed, does not implicate the values expressed in the NHPA; compliance with 470f, however, may be environmentally significant and is required by the express language of that section in any event. Thus, while the NHPA does not provide a legal shield of protection against the exercise of the federal condemnation power, it can provide the condemnee with a sword which he may use to seek judicial scrutiny of compliance with the congressional command that adverse impact upon historical features of the condemned land be mitigated. We have stripped the Uithovens of their asserted shield, but they may still, if they choose, wield the sword to enforce compliance.

■ The government argued on appeal that it has indeed fulfilled its duty under section 470f, and submitted numerous documents purporting to show that it has done so. The district court noted this claim, but made no express finding. We will not make this determination for the first time on appeal and decline to review the government's offerings, which are not contained in the record proper and should be submitted to the district court if it is called upon to decide the issue. That portion of the opinion and judgment below which strikes noncompliance with the NHPA as a defense to the condemnation itself will be affirmed, but that portion which leaves "only [the] question of just compensation for the court's consideration" will be vacated, and we remand the cause so that the district court may determine, on petition of the Uithovens, whether compliance has taken place. If the court finds to the contrary, it must then decide what remedial action is appropriate.

AFFIRMED IN PART AND VACATED IN PART; REMANDED FOR FURTHER PROCEEDINGS.