UNITED STATES of America, Plaintiff,

v.

162.50 ACRES OF LAND, MORE OR LESS SITUATED IN CLAY COUNTY, STATE OF MISSISSIPPI, and F.E. Uithoven, et al., Defendants.

Nos. EC78–26–LS–P, Tract No. 703, EC78–27–LS–P, Tract No. 736.

United States District Court, N.D. Mississippi, E.D.

June 30, 1983.

Glen H. Davidson, U.S. Atty., Falton O. Mason, Jr., Asst. U.S. Atty., Oxford, Miss., for plaintiff.

J. Arthur Smith, III, Baton Rouge, La., Thomas R. Trout, New Albany, Miss., Rufus Ward, West Point, Miss., for defendants.

## MEMORANDUM OPINION

SENTER, Chief Judge.

This counterclaim to a land condemnation action comes before the court on the Government's motion for summary judgment. The Government contends that its evidentiary materials demonstrate compliance under the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* (NHPA), and the National Environmental Policy Act, 42 U.S.C. § 4332 (NEPA), the two statutes upon which the landowners' counterclaim is based. The landowners have opposed the Government's motion, arguing that material fact issues remain and offering evidentiary materials of their own. However, this evidence does not contradict, but instead merely supplements, the evidence already before the court. As the court can find no area in which disputed material factual issues remain, the case is one proper for resolution under Rule 56.

As the Fifth Circuit's opinion in this case indicates, *see United States v. 162.20 Acres of Land, etc.,* 639 F.2d 299 (5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981), the landowners originally alleged a failure to comply with NHPA in 1978. This assertion was in the form of a defense to the Government's taking. However, the district court struck the defense as inappropriate, and this judgment was upheld on review, the Fifth Circuit finding that "[t]he transfer of title is an environmentally neutral action ... which does not implicate the values expressed in the NHPA...." *Id.* at 305. The Fifth Circuit did say, however, that a district court could enjoin the transfer of possession of condemned land pending compliance by the Government with applicable environmental legislation.[1]

■ Although it appears that plaintiff's NHPA compliance claims were probably

1. The Fifth Circuit stated that "a district court having before it a condemnation case may ... require compliance with section 470f [of NHPA] and either withhold possession by the government or take appropriate injunction action to enforce its order." *Id.* at 305. One form of relief suggested as appropriate by the landowner is that "the Government be required to reconvey to the Uithovens the property which it has taken from them under its purported right of condemnation." Counterclaim at p. 6. However, the Fifth Circuit's opinion implies that transferring title back to the landowners would not constitute an appropriate remedy, as the original transfer of title to the Government was an environmentally neutral act.

By retaining title to and control over properties with special historical and cultural features, the Government may preserve and protect such properties in a public trust. *See* Final Supplement to the Environmental Impact Statement (FSEIS) at 147. If lands originally condemned for use in the Tennessee-Tombigbee Waterway (TTW) are later withdrawn from the project, they must be disposed of in accordance with the following three priorities: 1) retention in federal ownership; 2) transfer to state or local governments, or 3) sale at auction to the highest bidder. FSEIS at 233. Congressional authorization would be necessary before

well taken when first asserted in 1978, subsequent NHPA measures taken by the Government—including drafting a plan for treatment of significant structures in the Tennessee-Tombigbee Waterway Multi-Resource District (TTWMRD) consented to by the Advisory Council on Historic Preservation on March 24, 1983,—lead the court to find that full NHPA compliance has now taken place. The facts as they presently exist do not warrant injunctive relief against the Government or further restraint on the transfer of possession of the condemned lands.

Like NEPA, the NHPA requires that specified procedures be followed. These procedures include consultation with the Advisory Council on Historic Preservation. However, 36 C.F.R. § 800.6(c)(3) allows the Government a short-cut method with which to prove NHPA compliance. It provides the following:

(3) *Effect of Memorandum of Agreement.* Agreements duly executed in accordance with these regulations shall constitute the comments of the Council and shall evidence satisfaction of the Federal Agency's responsibilities for the proposed undertaking under Section 106 of [NHPA], Section 2(b) of [Executive Order 11593], and these regulations. Failure to carry out the terms of a Memorandum of Agreement requires that the Federal Agency again request the Council's comments in accordance with these regulations.

In the present suit, the property involved is contained within the TTWMRD, a 130-mile long and 5-mile wide corridor superimposed upon the TTW from Paden, Mississippi, to Gainesville, Alabama. A Memorandum of Agreement (MOA) covering that entire district was ratified on December 19, 1977. *See* Exhibit I, Attachment A, April 22, 1983, motion for summary judgment. The MOA contains stipulations covering

both archeological and architectural resources. The landowners have not argued that the MOA's six stipulations concerning archeological resources have not been carried out, and all of the evidence in the record supports a finding that the MOA's archeological plans have been or are being put into effect. Accordingly, the only issue under NHPA is whether the MOA's architectural stipulations have been followed.

The landowners' briefs do not argue that the Government has not carried out stipulations 2(a) (continuing inventory evaluation) or 2(b) (application of National Register criteria). Therefore, the court's review will concentrate on stipulation 2(c), which provides as follows:

c. The Corps of Engineers, in consultation with the Alabama and Mississippi State Historic Preservation Officers, will develop a plan for the treatment of structures that meet the National Register criteria and that will be affected by the project. This plan will be submitted to the Council for comment pursuant to 36 C.F.R. Part 800 and shall document the project's effects on each property, include a review of alternatives that would avoid or mitigate any adverse effects, and indicate those alternatives considered to be the most feasible and prudent. The plan shall be accompanied by maps, survey documentation, and the views of the Mississippi and Alabama State Historic Preservation Officer.

Although the landowners' brief argues that the Government has yet to prepare the necessary plan for the treatment of structures, the landowners themselves have offered a copy of such plan as their exhibit number 6. The 52-page plan devotes six of its pages exclusively to Cedar Oaks, *see* pp. 14–19, 46–47; approximately twenty of the report's remaining pages apply to all TTWMRD structures collectively.

The Advisory Council's concurrence in the structure treatment plan is dated April 18,

land could be returned to its previous owner. *Id.* Accordingly, even if the landowners were successful, the remedy they requested would be

inappropriate under the Declaration of Taking Act, 40 U.S.C., § 258a.

1983. See Exhibit 1, Attachment B, April 22, 1983, motion for summary judgment. Accordingly, the court can apply the presumption of compliance contained in 36 C.F.R. § 800.6(c)(3) to find that the Government has carried out its obligations under stipulation 2(c). However, even without relying on the C.F.R. presumption, the court is of the opinion that the Government documents clearly demonstrate compliance with 2(c)'s obligations to (a) develop a structure treatment plan, (b) document the project's effect on each structure involved, (c) review reasonable mitigation alternatives, (d) select a most feasible mitigation alternative, and (e) submit supporting maps and documentation. Accordingly, the landowners' NHPA claim must be dismissed. Further court action withholding possession of the condemned lands on the grounds of NHPA compliance is not warranted.

Landowners' NEPA claim is based upon the Act's requirements contained in § 102(C) that all government agencies shall:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C). The landowner criticizes the FSEIS for not providing specific alternatives to the Barton Ferry Recreation Area and for not containing more detailed information about Barton Ferry, the Colbert-Barton Townsites, and Cedar Oaks. Landowners also criticize the government officials responsible for NEPA compliance for not taking the appropriate environmental actions at an earlier date.

■ Taking the last question first, the timeliness of environmental assessments is a valid issue in both NEPA and NHPA cases if it appears that irreversible commitments of resources have been made prior to the environmental assessment in such a manner as to increase the cost involved in selecting certain otherwise favorable environment choices. See City of Boston v. Volpe, 464 F.2d 254 (1st Cir.1972); Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1128 (D.C.Cir.1971). Another problem in the timeliness context is that if the agency waits to comply with NEPA until after it has become firmly committed to a certain project, it may, in less than good faith, reject other, more attractive, alternatives. See Sierra Club v. Lynn, 502 F.2d 43 (5th Cir.1974); Environmental Defense Fund, Inc. v. Corps of Engineers, 492 F.2d 1123, 1129 (5th Cir.1974).

There is no evidence that either of these problems affected the Corps' actions in this case. No irretrievable commitment of resources has been established—there is no evidence of preliminary construction on the recreation area, and the taking of title has been declared an "environmentally neutral" act. On the second point, the court must totally reject any argument that compliance efforts were made in less than good faith objectivity. After reviewing the studies, conferences, and suggested alternatives touching on the Colbert-Barton Townsites and the Cedar Oaks structure, the court is impressed with the manhours and financial resources committed to historic, cultural, architectural, and archeological endeavors and the depth of detail in the Government's actions.

The landowners' chief complaint with the FSEIS is that it did not isolate the Barton

Ferry Recreation Area from the remainder of the TTW and treat it separately (and exhaustively) as a single "major federal action" under 42 U.S.C. § 4332(C). The landowners would have had the FSEIS come up with detailed plans to deal with the following problems they see at Barton Ferry: changes in land usage; adverse impacts on wildlife; noise, air, and water pollution; erosion and sedimentation, and dislocation of a productive tree farm. Instead, the FSEIS's approach was to categorize certain impacts recurring along the TTW (i.e., danger to wildlife, effect on forestry, erosion problems) and to examine their cumulative impacts in arriving at mitigation plans or alternative actions.

■ The use of site-specific environmental impact statements (EIS's) to supplement programmatic EIS's has been discussed in connection with large federal undertakings where individual components of the project have unique impacts which might be overlooked in an EIS that only values cumulative impacts. However, the guiding principle in this area is that questions of EIS format are within the discretion of the issuing agency, *see Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079, 1092 (D.C.Cir. 1973). So long as the necessary depth of analysis is performed, the agency's decision between one large programmatic EIS or numerous site-specific EIS is irrelevant. *Id. Accord National Resources Defense Council, Inc. v. Administrator, Energy Resource & Development Administration,* 451 F.Supp. 1245, 1259.

■ The FSEIS here at issue does address each of the concerns raised by the landowners. *See, e.g.,* FSEIS pp. 66, 70–71, 183 (wildlife studies); pp. 16, 148–49 (land use & forestry). It also provides waterway-wide mitigation alternatives which should offset impacts upon wildlife and fish, destruction of cultural resources, losses to timber production, and the possibility of erosion. As the landowners have not criticized

a single one of these alternative mitigation plans as not suitable to meet losses at Barton Ferry nor attempted to demonstrate how the impacts at Barton Ferry are so unique as to mandate individualized consideration, their demand for a site-specific EIS must be rejected.

The only aspects of the Barton Ferry Recreation Area impact which appear to the court to merit individualized consideration are the area's unique archeological and architectural features because the recreation area will be built on land which was once occupied by three now extinct, sequentially-populated river towns: Colbert, Barton, and Vinton. However, review of documents outside the FSEIS, when read in conjunction with the FSEIS, demonstrates that in-depth individualized attention was given to both architectural and archeological resources at Barton Ferry. A very substantial financial commitment was made so that excavations might be completed prior to otherwise damaging construction operations. Further, the structure Cedar Oaks has been examined and re-examined, data about its features and dimensions has been recorded, and several mitigation alternatives have been devised so that immediate destruction of the structure can be avoided. After reviewing all these documents, the court cannot understand the landowners' arguments that the Government has failed to adequately address the impacts of the Barton Ferry area.

In a recent U.S. Supreme Court opinion, *Metropolitan Edison Co. v. People Against Nuclear Energy,* —— U.S. ——, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983), the Court noted that "[n]either the language nor the history of NEPA suggests that it was intended to give citizens a general opportunity to air their policy objections to proposed federal actions. The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Id.* at ——, 103 S.Ct. at 1563, 785 L.Ed. at 544. From the evidence now before the court, it appears that when the defense of NHPA

compliance was first raised by landowners, substantial merit supported that position. However, studies undertaken and materials compiled in the five years since that time have gone a long way to cure the previous deficiencies and to elevate environmental concerns. The court having disposed of all of the landowners' objections based upon NHPA and NEPA compliance requirements, landowners' position is now reduced to a mere disagreement with the Government's policy decision to proceed with the Barton Ferry Recreation Area despite the acknowledged impacts. On this ground, the court can grant no relief. Accordingly, an appropriate order will be entered decreeing a judgment in the Government's favor on defendants' counterclaim.