UNITED STATES of America, Plaintiff,

v.

ACQUISITION OF 0.3114 CUERDAS OF CONDEMNATION LAND MORE OR LESS, LOCATED ON CALLE O'NEILL, HATO REY, RIO PIEDRAS NORTE WARD, MUNICIPALITY OF SAN JUAN, PUERTO RICO; B.B.I. Mortgage Corporation; Deli Restaurant; Autoridad De Acueductos y Alcantarillados; "Unknown Owners", Defendants.

Civ. No. 90–2171 (JAF).

United States District Court,
D. Puerto Rico.

Dec. 10, 1990.

José M. Pizarro Zayas, Asst. U.S. Atty. and Daniel F. López–Romo, U.S. Atty., San Juan, Puerto Rico, for plaintiff.

Antonio Fiol–Matta, Director Federal Litigation Div. Dept. of Justice, Com. of Puerto Rico and Héctor Rivera Cruz, Secretary of Justice, San Juan, Puerto Rico, for defendants.

1. GSA is charged with the job of selecting sites for federal buildings and acquiring those sites

OPINION AND ORDER

FUSTE, District Judge.

In August of 1990 the United States appropriated a small parcel of land, 1,223.-8025 square meters in size, in metropolitan San Juan, Puerto Rico. The land was owned by the Commonwealth of Puerto Rico. The United States alleges that it took the land in order to construct an emergency exit ramp for the soon to be occupied federal building and courthouse located on the land contiguous to the parcel at issue here. Puerto Rico seeks to regain title to the land to use it as part of a project to rebuild this area of San Juan. The United States has already deposited $460,000 in court as the proposed compensation for the taking. Defendants claim, first, that the taking itself was illegal, in that Puerto Rico has already slated the land for a superior prior public use. Second, Puerto Rico claims that a different parcel will satisfy the needs of the federal government, without interfering with their pre-planned redevelopment, and that it is an arbitrary and capricious decision for the United States to choose the lot they have chosen. Those arguments failing, Puerto Rico claims that the amount of proposed compensation is insufficient.

*Facts*

A new federal courthouse is in the last stages of completion in Hato Rey, the financial/business center of metropolitan San Juan, Puerto Rico. The General Services Administration (GSA)[1] of the federal government has determined that a secondary, secured means of egress for federal judges, U.S. Marshals, and other law enforcement officials should be provided from the current site, in case of criminal attempts on the facility. Towards that goal GSA began, at least as early as the summer of 1988, to plan a paved ramp exit, which would leave the rear of the federal courthouse and proceed to a nearby roadway. A pair of empty lots (the parcel of land at issue here) were identified by GSA

by means of purchase or condemnation. 40 U.S.C. § 604.

as the likely candidates for the egress road. Since the two lots (hereinafter "subject property") were owned by the Commonwealth of Puerto Rico, the GSA representative began a series of negotiations with the relevant Puerto Rico officials. At first the negotiations contemplated a "swap" of easements. Under this deal the federal government would obtain an easement to build its egress road through the subject property from the back of the courthouse. In exchange, Puerto Rico would be granted an easement onto some federal land which Puerto Rico needed in order to widen a road which abutted the courthouse on the "front" side. The deal fell through when the Puerto Rico officials became aware that the subject property was already identified by Puerto Rico as necessary for a proposed road that formed part of a proposed urban transportation plan. In fact, the land came into the ownership of Puerto Rico originally as the result of a condemnation action from private persons carried out to further the transportation plan.

■ Puerto Rico's plan for the area in which the subject property is located began to take shape in the early 1960's, and took the title "Nuevo Centro de San Juan" (hereinafter "NCSJ"). The purpose of the plan was to provide a modern city center in the Hato Rey section of San Juan. One element of the plan was an overhaul of the existing transportation in the area, including the installation of new roadways, highways, and mass transit facilities. Specifically, a 1970 study of transportation for the NCSJ proscribed the construction of a road which would pass directly over the subject land. This proposed roadway (the so-called "Hostos Extension") is the public use for which Puerto Rico seeks to reacquire the subject property. In the 1970 plan, and according to defendants' current papers,

after crossing the subject property, the Hostos Extension would then go on to completely bisect what is now the federal courthouse complex, running on what is now completely federally-owned lands, cutting the courthouse off from its own parking facilities.[2]

On January 4, 1990, GSA informed Puerto Rico that it had in fact identified the subject land as necessary to provide "greater security for the U.S. Courts," that it no longer sought merely to exchange easements, and that it wished to acquire the subject land outright through purchase. The letter spoke of the urgency of the situation, since the move to the new courthouse was scheduled for the fall of 1990.

The Puerto Rico Land Administration (PRLA) refused to sell the subject property, and instead offered to sell GSA a different site, also abutting the rear of the court building, which the PRLA was (and still is) in the process of acquiring from the Puerto Rico Ports Authority.

On August 17, 1990, the Administrator of General Services, through his assignee, signed a declaration taking the subject property in the name of the United States. On August 30 the present complaint was filed.

*Legal Standard for a Taking*

■ The United States has broad powers as the sovereign to take lands it deems necessary for public use, subject to the constitutional directive that just compensation be paid. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Under the procedure employed here, the government "at any time before judgment" in a condemnation action may file a "declaration of taking" "declaring that said lands are thereby

---

**2.** According to defendants, the NCSJ plan would be carried out at least in part by federal funds, such as Urban Assistance Grants (UDAG) from the Department of Housing and Urban Development (HUD) and the Federal Highway Administration. We do not believe it relevant that federal funds might be used in connection with Puerto Rico's planned "public use." The land is owned by the Commonwealth of Puerto Rico, and would be developed under their ownership.

We will examine this situation as we would any federal taking of land designated for a previously existing (or planned) *state* public purpose. We do note, however, that if the federal government had already appropriated the land itself for a use other than the use to which GSA now wants to put the land, our analysis would be quite different. Receiving federal funds, however, does not convert this to a prior *federal* use.

taken for the use of the United States." 40 U.S.C. § 258a. *See* Fed.R.Civ.P. 71A. The statement must set out the authority under which the land is taken,[3] describe the estate or interest taken, contain a description and depiction of the land taken, and an estimate of the compensation to be paid. *Id.* The condemnor must deposit with the court the estimated compensation. *Id.* Immediately upon the filing of the declaration and the deposit, the title of the land vests in the United States. *Id.* In the proceeding which follows the condemnation, the court determines whether the estimated compensation is proper, and adjusts that amount up or down as required. *Kirby*, 467 U.S. at 5, 104 S.Ct. at 2191.

Although the procedure assumes that the "taking" is a *fait accompli* once the declaration is filed, a minimal level judicial review to "approve" the taking is still available when the condemnee objects to the condemnation itself. *Catlin v. United States*, 324 U.S. 229, 241, 65 S.Ct. 631, 637, 89 L.Ed. 911 (1945) ("We find nothing in [40 U.S.C. 258a et. seq.] to indicate that Congress intended to deprive the owner of all opportunity to challenge the validity of the taking for departure from the statutory limits").

First, the court must determine that the condemnor was in fact authorized by the legislature to effectuate the taking. *United States v. 7.92 Acres of Land, More or Less, Situated in the Towns of Provincetown and Truro, County of Barnstable, Commonwealth of Massachusetts*, 769 F.2d 4 (1st Cir.1985) (Reviewing scope of Cape Cod National Seashore Act); *Nat. R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261 (2nd Cir.1987), *cert. denied*, 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987); *United States v. 162.20 Acres of Land, More or Less, Situated in Clay County, State of Mississippi*, 639 F.2d 299 (5th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). Where, as here, the statutory authorization involves some discretion on the part of the

official making the condemnation, the act will be found to be authorized so long as the discretion is not abused, so long as the selection of the means to accomplish the authorized purpose is not arbitrary and capricious. *United States v. Carmack*, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946).

Second, the court must determine that the taking is for a public use. *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). The court will not dispute the legislature's determination of what constitutes a public use unless that determination is completely void of reasonable foundation. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240–41, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984); *U.S. ex rel. T.V.A. v. An Easement & Right–Of–Way*, 682 F.Supp. 353 (M.D.Tenn.1988). Similarly, the official exercising discretion under a congressional grant of authority will be given great latitude in identifying a public purpose. *United States v. Carmack, supra.*

Therefore, if the taking is for a public use and is being exercised within the discretion of the authorization given to the official carrying out the taking, the court's inquiry is at an end. While the authorization and public purpose are matters for judicial review, the "necessity and the scope of the taking" which suit the purpose at hand are a legislative matter. *U.S. Ex Rel. T.V.A.*, 682 F.Supp. at 353. "It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area." *Berman v. Parker*, 348 U.S. at 26, 75 S.Ct. at 98.

### Federal Taking of State Owned Property

The power of the federal government to condemn state land is well-settled. *United States v. Carmack, supra.* The State cannot limit or frustrate that power. U.S. Const. art. 6, cl. 2 (Supremacy Clause), *United States v. 11.037 Acres of Land*, 685 F.Supp. 214, 217 (N.D.Cal.1988). Similarly, the power to take land within the territo-

---

**3.** 40 U.S.C. § 258a is a procedural statute. The power to condemn is generally derived from a separate statute which vests power in an official for condemnation for a specific purpose, or from a statute which condemns a particular area or parcel.

ries is unquestioned. As the Supreme Court stated in *Cherokee Nation v. Southern Kansas R. Co.*, 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295 (1890), "[i]t would be very strange if the national government, in the execution of its rightful authority, could exercise the power of eminent domain in the several states, and could not exercise the same power in the territory occupied by an Indian nation or tribe, the members of which were wards of the United States, and directly subject to its political control." [4] Indeed, defendants do not challenge the general right of the United States to condemn property situated in and owned by Puerto Rico.

Instead defendants argue that Puerto Rico's plan for the subject property contemplates a use prior and superior to the use for which the United States took the land. They emphasize that the Hostos Extension is a critical element in a major transportation plan for the area. They diminish the federal "need" for the subject plot by arguing that a substitute plot could be made available which would not interfere with the NCSJ plan and would satisfy the federal requirements for an egress road.

Defendants' reliance on the doctrine of prior public use is somewhat misplaced. The doctrine originally provided that where land was already put to an actual or proposed public use, only a specific legislative authorization could condemn it for a different (and inconsistent) public use. The doctrine was necessary because general delegations of eminent domain authority can be given to many delegates at the same time. Both the public electricity company and the local railroad may be authorized by the state to condemn land. Without the prior use doctrine, there could be a free for all of battling entities all equipped with eminent domain power, passing title back and forth. It was necessary, then, that a public use be protected from all taking save a specific legislative directive. (Naturally, if the legislature determines that the power plant must be replaced by a rail line,

that choice, as a specific directive from the sovereign, overrides the original decision to use the land for power production). Sackman, J.L., *Nichols' The Law of Eminent Domain*, (Revised 3rd Ed.1980) Section 2.21.

For a time, the federal government, in taking state land, was also subject to the rule, but

> [i]t was later reasoned that such conclusion was based on the erroneous theory that the federal government was in the same position as any other party, such as a municipal or probate corporation, to whom the power of eminent domain had been delegated. As to such entities there was and is no question that the grant, being in derogation of the sovereign power, was subject to the rule of strict construction. This theory failed to take into account the character of the federal government as a sovereign and that it acted as such in the exercise of the power. Accordingly, the general rule was not applied to such a taking.

*Sackman* at 2–122 (citations omitted).

■ Therefore, even where the state land is already devoted to a public use, the United States may take subject only to the requirement of compensation, and the limitation that the contemnor exercise discretion in a manner that is not arbitrary and capricious. *United States v. Carmack*, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946). (In Federal taking of City land, Court treated City land as "State" land in light of the fact that City is a subdivision of State); *United States v. 20.53 Acres of Land in Osborne County, Kansas, City of Downs*, 263 F.Supp. 694 (D.Kan.1967). We may not, as defendants urge us to do, apply a first-in-time, first-in-right rule here, nor may we weigh the relative benefits of the two proposed public uses and make a judicial finding that one is "superior" to the other (meaning more important or more beneficial to the public). The federal use is deemed to be superior *precisely because it*

---

**4.** We make no statement about the specific applicability of the Territorial clause to Puerto Rico.

*is the federal use.* Instead we must find that congressional authority to take was granted, that the exercise is within the grant of that authority, that the taking is for a public use, and that the choice of the particular site was not arbitrary and capricious.

Here the authority, unchallenged by defendants, is vested in the Administrator of General Services in 40 U.S.C. § 604.[5] The statute provides that "The Administrator is authorized to acquire, by purchase, condemnation, donation, exchange, or otherwise, such lands or interests in lands as he deems necessary for use of sites, or additions to sites, for public buildings authorized to be constructed or altered under this chapter." The power here is being exercised by William J. Diamond, Regional Director of GSA, under a delegation of authority from the Administrator in accordance with GSA delegation procedures.

■ It is unchallenged that taking land to build an extension to the federal building is within the authorization given to GSA. The need for a second egress as an integral part of the federal complex in Hato Rey is also unchallenged. Therefore, plaintiffs establish without opposition that the proper authority to take some piece of land exists, and that the taking is for a public purpose.

■ Though we reject defendants' claim that Puerto Rico's prior use can usurp federal prerogative, as such, we will examine Puerto Rico's complaints in the light of the fact that the specific site selection must not be arbitrary and capricious. As to the charge that the selection of this particular piece of land is arbitrary and capricious, or was made in bad faith, *United States v. Carmack*, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946), is almost directly on point. In *Carmack*, the United States condemned an area of city land on which sat the city hall, the county courthouse, other public buildings, and a public park. (The *Carmack* court treated the land as owned by a subdivision of the state, and made its analysis as if the land were actually state land.) The United States

sought the land to build a post office and customs house. The United States relied for its authority on the Public Buildings Act of May 25, 1926, the precursor to the act relied upon by GSA here. The taking in *Carmack* was accomplished by the Federal Works Administrator (working with the Postmaster General) under a general grant of authority to select and acquire sites for public buildings, in the same way that the present day Administrator was authorized to take land in the case before us. In *Carmack*, as here, the party objecting to the condemnation argued that the prior public use of the land by a state subdivision required that the Federal Works Administrator choose one of many other available sites. The Court flatly rejected that proposition, and accepted the government's arguments instead:

> The government here contends that the officials designated by Congress have been authorized by Congress to use their best judgment in selecting post offices sites. It contends also that if the officials so designated have used such judgment, in good faith, in selecting the proposed park site in spite of its conflicting local public uses, the Federal Works Administrator has express authority to direct the condemnation of that site. We agree with those contentions. We find in the broad terms of the Public Buildings Act authority for the designated officials to select the site they did.... The judgment exercised by the designated officials in selecting this site out of 22 sites suggested, *and out of two closely balanced alternatives, constituted an administrative and legislative decision not subject to review on its merits.*

*United States v. Carmack*, 329 U.S. at 242–43, 67 S.Ct. at 257–58 (emphasis added).

The *Carmack* Court went on to show that the decision was one based on a deliberative process, sufficient to overcome the charge of arbitrariness. The Court rejected the district court's finding that the taking was "arbitrary and unnecessary." The

---

**5.** Plaintiffs cite their authority as the Public Buildings Act of 1959, Pub.L. No. 86–249, the relevant sections of which are now codified at 40 U.S.C. § 604.

Supreme Court opined that the district court's holding was erroneously based on the district court's own weighing of comparative desirability. *Carmack*, 329 U.S. at 247, 67 S.Ct. at 260.

Here the decision to take this particular parcel of land came about as a result of a protracted two-year process. It was originally identified as the most desirable parcel by GSA for the job required, as evidenced by the fact that it was the subject of the original negotiations between the United States and Puerto Rico. Defendants claim that the "sudden" decision of GSA in January 1990 to purchase the land outright rather than settle for traded easements demonstrates that the subsequent taking was capricious, arbitrary, and in bad faith. Defendants seem to argue that once the United States enters into negotiations, any resort to an eminent domain proceeding is in bad faith. Their argument urges that the United States has less power to condemn where it first attempts to gain the desired land through negotiations or purchase than where it condemns without trying to negotiate first.

We think just the opposite is proved by the history of the negotiations. We see GSA carefully evaluating the various options available to it, choosing a particular option, and engaging Puerto Rico in discussions in order to achieve that objective. The length of the negotiations process, and the fact that various options were debated and finally rejected, are indicia of exactly the kind of deliberative process that is the antithesis of irrational decision making. When it became apparent to the United States that Puerto Rico was not going to give up the subject land through a negotiated settlement, it resorted to its trump card, condemnation.

We see that timing was critical to GSA's decisions with regard to obtaining the desired land. GSA, as early as January of 1990, was urgently trying to settle the egress issue. Puerto Rico's argument that it *might* soon be able to provide the United States with an alternative site is no substitute for the immediate condemnation of a property already found to be well-suited for the required use. It would not be arbitrary, capricious, nor in bad faith for the United States to have condemned this particular parcel rather than another, simply because it is empty *now*, and because the plans for the egress through that spot are already prepared. That some other lot *might* be available in the future is not sufficient for us to find that the determination to use one over the other was in bad faith or arbitrary.

We are also constrained to reiterate that, even if Puerto Rico retained the small parcel at dispute here (about a third of a football field on each side), they still could not complete their proposed Hostos Extension without completely bisecting the newly finished federal court complex. They would need to obtain a substantial section of federal land currently in use. Since Puerto Rico has no power to condemn federal land currently put to federal use, the original 1970 plan to put this road through now seems an impossibility quite apart from the current dispute. This point is not lost on GSA, who operates the complex over which any Hostos Extension would run, and who would have the power to either allow the roadway through or not. Defendants themselves supplied this court with an internal Puerto Rico Department of Transportation and Public Works memorandum dated March 6, 1990, sent to the Assistant Secretary for Planning, which contains the following observations:

> For the construction of the roadway between Chardón Street and O'Neill Street [the Hostos Extension] it would be necessary to use Federal Government property that is presently being used as a parking area for federal offices.
>
> . . . .
>
> One critical aspect of this decision [not to sell the subject land] *relates to the process to obtain the federal property necessary for the construction of* [the Hostos Extension]. We point this out because unofficially "GSA" has already indicated to us that they do not support the construction of this road because it would divide their property. (Emphasis in original; translation ours).

This document highlights the point that the Hostos Extension is unlikely ever to come into being, *even if the subject property was left in the hands of Puerto Rico.* Defendants' argument can be reduced to the following: GSA should have chosen a plot other than the subject property so that the plan for the Hostos Extension could be protected, even though those same GSA officials have no intention of yielding the additional federal land needed to effectuate the Hostos plan. We will not require such an absurdity.

### Title Taken

██ A few miscellaneous issues remain surrounding the taking itself. The Puerto Rico Aqueduct and Sewer Authority (PRASA) appears with regard to a perpetual easement and restrictive covenant (edification) on the subject plot. PRASA does not seek to reverse the condemnation, nor to receive compensation, but only to preserve its easement and restrictive covenant. It is clear from the declaration of taking that the property was taken in fee simple absolute not subject to the rights claimed here by PRASA. With respect to public utility facilities, the declaration submitted by GSA subjects the United States' estate only to the "right of the owners of public utility facilities, if any, upon, or under the land, to remove such facilities." It is true that the United States would have such power to extinguish PRASA's rights, subject to the compensation necessary to pay the cost of rerouting the lines. Sackman, *Nichols on Eminent Domain, supra,* Section 5.14, at 5–213; *American Telephone and Telegraph Co. v. Madison Parish Police Jury,* 465 F.Supp. 168 (W.D.La.1977). However, in the case before us, the United States has raised no opposition to PRASA's motion to have the taking be revised so as to be subject to PRASA's current easement and restrictive covenant. We therefore order that the taking is subject to the recorded easement and restrictive covenant held by PRASA on the subject property.

The United States has identified an outstanding mortgage held by B.B.I. Mortgage Corporation in the amount of $20,-000.00. The payment of the promissory note which the mortgage guarantees was due and payable on August 1, 1987. The mortgage is constituted by virtue of deed number 381, executed in San Juan, on July 5, 1962, before Notary Public Francisco González, Jr., recorded at page 178 of volume 706 of Río Piedras Norte, Property Number 20298, 3rd inscription.

The United States identifies a possible month-to-month lease for parking held by a neighboring restaurant called the Deli Restaurant (235 Roosevelt Avenue).

██ Neither the Deli Restaurant nor B.B.I. Mortgage Company have appeared. The United States seeks default judgment against them. The United States also seeks an order directing the Registrar of San Juan (Section III) to cancel the mortgage. The default judgments as to the propriety of the taking itself are **granted.** Puerto Rico law governing the recording of deeds following condemnation proceedings recognizes that the interests of these third parties having been extinguished, the recording of the property should be completed accordingly:

> Section 2 of the Mortgage Law establishes the instruments that can be recorded in the registries of property. Among them are the deeds *conveying* or *declaring* the ownership of real property or of property rights therein. The title that is acquired through condemnation proceedings in the exercise of the power of *eminent domain* of the State [here federal government] is a new title that does not convey any right of the former owners or person having an interest in the real property involved in the condemnation proceedings, by one that declares that the condemnor acquires a new title, absolute against all the world, and cancels and extinguishes all the rights which third persons might have on the condemned property.

*P.R. Aqueduct Service v. Registrar,* 70 P.R.R. 216, 222 (Sup.Ct.P.R.1949).

The Registrar of San Juan is ordered to

**58**

cancel the mortgage referred to above.[6] However, we reserve decision on how the cancellation of the mortgage at issue here, and the possible month-to-month lease, will affect the issue of just compensation. The cancellation of the mortgage and lease, if any, may result in compensation being due to those parties, and upon setting compensation, this court may make provisions to protect the possible rights of those claimants.

### Conclusion

In short, we find nothing constitutionally objectionable in GSA's decision to declare a taking of the subject property here. While GSA might have chosen another site which would not have interfered with a state proposed plan (however tenuous that plan might be), they were not constrained to do so. This land was taken for a congressionally authorized public purpose, as the result of a protracted series of attempts by the United States, through GSA, to provide a safe egress route from its building. The taking thus effected suffers no infirmity. Title is properly vested in the United States in fee simple, subject to the public utility easement referred to above.

Since a material issue of fact remains as to the adequacy of the proposed compensation, we leave that matter for trial. Each side will submit pretrial memorandums setting out their allegations as to the valuation of the land in question within sixty (60) days.

IT IS SO ORDERED.

---

6. The U.S. Attorney will prepare a form of order for purposes of registry cancellation of this mortgage. The same will be filed **within ten (10) days.**