**COMMITTEE TO SAVE THE FOX BUILDING, Plaintiff,**

v.

**BIRMINGHAM BRANCH OF the FEDERAL RESERVE BANK OF ATLANTA, Defendant.**

**Civ. A. No. 80–C–1185–S.**

United States District Court, N. D. Alabama, S. D.

Sept. 22, 1980.

Richard Groenendyke, Groenendyke & Salter, Birmingham, Ala., for plaintiff.

A. W. Jones, W. S. Pritchard, Jr., Pritchard, McCall, Jones, Spencer & O'Kelley, Birmingham, Ala., for defendant.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

On September 11, 1980 the plaintiff Committee to Save the Fox Building filed the

instant action, seeking preliminary relief against the impending demolition of a building by the defendant Federal Reserve Bank of Atlanta. As the building was scheduled for demolition within the next twenty–four hours, this Court set, for immediate hearing on the same day, plaintiff's application for a temporary restraining order. At the conclusion of the hearing, the Court issued the requested order; scheduled a hearing on plaintiff's motion for a preliminary injunction five days thereafter; and, pursuant to F.R.C.P. 65(a)(2) ordered that the trial of this action on its merits be advanced and consolidated with the hearing on the motion for a preliminary injunction. The consolidated matters were heard by the Court on September 5, 1980.

### Statement of the Facts

The Committee to Save the Fox is an unincorporated association of individuals, each of whom is a resident citizen and taxpayer of Birmingham, Alabama. Its members claim an interest in architecturally and historically significant buildings in Birmingham; and they seek to protect and preserve the public interest in such properties.

The defendant is one of twelve regional banks of the Federal Reserve System. Each of the twelve regional banks is a separate corporate body, administered by a nine–member board of directors. Three of the members of the board of directors of each regional bank are appointed by the Board of Governors of the Federal Reserve Board. The remaining six directors are elected by the shareholders of the regional bank. Moreover, approval by the Board of Governors of the selection by the regional directors of the president and first vice-president of each regional bank is required. Approval by the Board of Governors of major real estate transactions by the regional banks is similarly required.

Admittedly, the Federal Reserve Board is a federal agency. Its seven–member Board of Governors is appointed by the President of the United States with the advice and consent of the United States Senate. The federal reserve system, administered by the Board of Governors through the Federal Reserve Bank and the twelve regional banks, generally implement the fiscal policies of the United States. Among other things, the federal reserve banks provide central coordination of United States savings bonds; act as depositories for money held in the United States Treasury; act as fiscal and monetary agents of the United States; issue currency, facilitate check clearance and collection; and provide important services for the Treasury with respect to the public debt and the issuance, handling and redemption of government securities. The profits of federal reserve banks, in excess of six percent, are paid directly into the Treasury of the United States. And each of the regional banks of the federal reserve system is exempt from payment of federal income taxes, unlike any private corporation.

In 1975, the defendant Federal Reserve Bank of Atlanta embarked on a long–range program of acquiring the remaining properties in the city block (Block 61) in which its Birmingham Branch is located. The short–term need of the Birmingham Branch was to provide increased security for its employees by erecting a parking area adjacent to the building in which the Birmingham Branch is housed; the long–term need was to acquire land needed for the future expansion of the Birmingham Branch on its present site. It was clearly the expectation of the defendant that such buildings as were located on these parcels of property would be razed.

On October 3, 1975 the Board of Governors of the Federal Reserve System–admittedly a federal agency whose approval was required for the acquisition of the Block 61 property–approved and authorized the expenditure of $2,150,000 to purchase the remaining fourteen (14) parcels of real estate in Block 61. Although the Board of Governors implicitly approved of the demolition of the buildings on the properties to be acquired, its approval of expenditures did not at that time include the anticipated costs to be incurred in the demolition and

removal of the then–existing structures on the said properties.

Between 1975 and 1978 the defendant acquired nine of the fourteen Block 61 parcels not already owned by it. In early March, 1978 the defendant acquired, for the sum of $350,000, Lots 18 and 19 of Block 61–the property on which the Fox Building sits.

At the time of its acquisition of the Fox Building, the defendant was unaware of any historical or architectural significance imputed to the building. One of the former owners of the building described the situation:

"My father together with the Sloss and Aland families owned the Fox Building from 1946 until the time it was transferred to the Federal Reserve. The ownership was over a third of the years of the building's existence (sic). The only history that was related to me, was that the building was ill–conceived and was known as a white elephant from the beginning. This was hardly an achievement for which the Fox Building has an exclusive on. In fact it's (sic) best day was the day it (sic) gave a deed to the Federal Reserve." DX 10, Letter of Robert W. Shepherd.

The defendant, it follows, did not consider the architectural and historical impact of the Fox Building when it bought the property in 1978.

Over a year after it acquired the Fox property, the defendant commenced efforts to demolish the Fox Building. After receiving the necessary approval of funds for the demolition of the buildings, the defendant entered into a demolition contract with Bama Demolition Company in August, 1979, under which the defendant was obligated to pay to the demolition company some $13,500 plus salvage. The demolition company proceeded to obtain a building permit for the demolition of the building; and on August 17, 1979 the City of Birmingham issued the permit. After the demolition of the Fox Building had started but had not substantially proceeded, the City of Birmingham abruptly and without explanation on August 30, 1979 suspended the permit for the demolition of the building.

The Birmingham Historical Commission says of the Fox Building

"The Fox Building, with its name and date still prominent on the facade, is a handsome late 19th century commercial building, one of few remaining in downtown Birmingham. The Fox family for whom it is named were important in the city's early business and political history. In 1895, the Fox brothers–John George, David James, and William Thomas–built a three–story grocery and meat market on Fourth Avenue across 19th Street from the city hall. Sturdily constructed of brick and adorned with classical swags, a handsome cornice, and hugh cast–iron columns at street level, the well–proportioned building housed the largest grocery store in the city. . . .

On the third floor of the building was an immense open hall distinguished by tall, round–headed windows that filled it with light. Known as the "third loft," the hall was rented to community groups for meetings, concerts, and religious services. In 1897 the Church of Christ, now located in West End, started here.

The Fox family, originally English, came to Birmingham by way of Canada. John Fox and Annie Smith were married in England in 1847. Between 1850 and 1864, five girls and three boys were born to them in various parts of western Canada. Members of the family arrived in Birmingham sometime before 1888, when John Fox, Sr., is first listed as a grocer in the city directory. That year marks the height of the first Birmingham boom. . . .

John Fox's Sons Groceries continued in the Fox Building until 1910. From then through the Depression, it was occupied by a meat market, a drugstore, and a barber shop, with offices of the Birmingham Business College on the second floor. Later the Chicago Clothing Company, a shoe store, a finance company, and the Paris Men's Shop were located in the building."

The recent history of the Fox Building is somewhat less auspicious. The building is and has been an unoccupied eyesore for several years. Many of its windows and doors are boarded–up; some of the flooring has been removed, cracks are apparent in the walls and ceilings. Much of the ceiling is non–existent; and rainspots attest to the deteriorated condition of the roof. The old interior and exterior paint, peeled from the walls by time, has over the years deteriorated into dirt and dust. The garbage and debris that are to be found throughout the building are a welcome sign to rats and other vermin.

The realty company which managed the Fox Building[1] for its former owners states that the building "... structurally is really not worth saving." It further states that "there are a number of buildings in Birmingham which would preserve the same type of architecture without interfering with plans for a major development."

Following the suspension of the building permit,[2] officials of the City of Birmingham and various groups undertook, considered and explored several alternatives to the demolition of the Fox Building. While it might have immediately, and probably successfully, challenged the City's arbitrary suspension of the license under which the building was to have been demolished, the defendant chose not to do so. Instead, it acquiesced, for nearly a year, in the efforts of the City and interested groups toward preserving the building.

Within three months after the demolition was halted by the City, its mayor notified the defendant that he had "... been presented with a firm offer from a private source who would buy the building and renovate it for office use." The defendant heard nothing further from the mayor with respect to this "firm offer."

At one point, the City requested that the defendant "donate" the building to the City so that it might be preserved. The defendant, pointing to its status as a corporation, declined this suggestion.

Two months ago, the City of Birmingham offered to buy the property in question for roughly $183,500 and vacation of the alley bounded by Fourth and Fifth Avenues and Eighteenth and Nineteenth Streets. Having paid approximately $350,000 for the property two years earlier, the defendant understandably declined the offer.

Although the controversy surrounding the impending demolition of the Fox Building was widely reported in the local news media, no private developer has as of now approached the defendant and inquired of the building's availability for sale. Plaintiff presented no evidence of any group or association's interest in actually acquiring and/or restoring the building. This rather startling lack of interest by public or private groups or associations in acquiring and restoring the building is at least in part attributable to the rather substantial sum (shown by the evidence as being between $750,000 to $1,000,000) required for the acquisition and restoration of the Fox Building and the perception that there are several other old buildings in downtown Birmingham more worthy of preservation.

Officials of the City of Birmingham have explored other alternatives to the demolition of the building, all to no avail.

The defendant has considered the impact of the demolition of the Fox Building in its board meetings since August, 1979. It has met with city officials and interested private individuals on several occasions in an effort to reach an amiable solution to the controversy.

Between August 20, 1979 and November 15, 1979 the defendant was notified of the historical significance of the Fox Building.

[1]. This same firm also managed the Steiner Building, constructed in 1890, and it is of the opinion that that building is structurally sound. The Court judicially notes that the Steiner Building has, within the past ten years, been restored and now serves as an office building in downtown Birmingham.

[2]. The Court finds that the building or demolition permit was suspended by the Mayor for the purpose of exploring various alternatives by which the Fox Building might be saved or preserved.

By March, 1980 the defendant had received notice that steps were being taken to nominate the building to the National Register of Historic Places. The defendant opposed the nomination; but notwithstanding the opposition, on June 17, 1980 the Alabama Historical Commission nominated the Fox Building to the National Register of Historic Places. On August 11, 1980 the United States Department of the Interior added the Fox Building to the National Register of Historic Places.

In the meanwhile, the City of Birmingham apparently concluded, after exhausting all alternatives, that the demolition of the Fox Building should no longer be deferred. On August 20, 1980 City Councilman John Katapodis unsuccessfully sought to have the City Council utilize its power of eminent domain to condemn the building. The effort failed by a 6–3 vote. The mayor of the City then authorized the re–issuance of the demolition permit.

The City Council's action in declining to commence condemnation proceedings against the Fox property was indubitably influenced by the consideration that should Block 61 in its entirety be unavailable for expansion by defendant, the City of Birmingham would risk a loss of the federal reserve bank to a surrounding municipality or unincorporated area. This fact was properly brought to the City Council's attention by the defendant.

On September 10, 1980 the defendant agreed to pay to Bama Demolition Company an additional $8000 for the demolition of the Fox Building.

### Issues Presented

For decision by the Court are three principal issues:

1. Does the plaintiff, Committee to Save the Fox Building, have standing to bring this action?

2. Is the defendant, Federal Reserve Branch of Atlanta, a "federal agency," within the meaning of the National Historic Preservation Act, and the National Environmental Policy Act, and, if so

3. Should this Court enjoin the planned demolition of the Fox Building for want of compliance by the defendant with the National Environmental Policy Act and/or the National Historic Preservation Act?

### Discussion

■ The standing of the plaintiff association to bring this action is clear. To meet the Article III requirement of a "case or controversy," plaintiff must show that the challenged action will cause them injury in fact and that the alleged injury relates to an interest arguably within the zone of interest protected or regulated by the statutes that the federal agencies are claimed to have violated. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Courts have held that the injury in fact requirement is satisfied by a showing of harm to the aesthetic and environmental well–being of the plaintiff. *Sierra Club, supra; Edwards v. First National Bank of Dundee*, 393 F.Supp. 680 (N.D.Ill., 1975); *Ely v. Velde*, 321 F.Supp. 1088 (E.D.Va., 1971); *aff'd in part and rev'd in part*, 451 F.2d 1130 (4th Cir.); *U.S. v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Weintraub v. Rural Electrification Adm.*, 457 F.Supp. 78 (M.D.Pa., 1978). In the instant case, a showing by plaintiff of the imminent demolition of a building listed on the National Register of Historic Places is sufficient to establish plaintiff's standing to sue.

■ The Court concludes that for purposes of the National Environmental Policy Act and the National Historic Preservation Act, the Federal Reserve Bank of Atlanta is a "federal agency."

Regional Federal Reserve Banks have been held to be operating agencies of the federal government, under the direction of the Federal Reserve Board, and created to supply a need of the national government. *Raichle v. Federal Reserve Bank of New York*, 34 F.2d 910 (2d Cir., 1929); *Federal Reserve Bank of Minneapolis v. Register of Deeds for Delta County*, 288 Mich. 120, 284 N.W. 667 (1939).

Numerous other cases have recognized and explained the governmental character of the Federal Reserve Banks. The court in *Federal Reserve Bank of Richmond v. Kalin,* 77 F.2d 50 (4th Cir., 1935) held that the Federal Reserve Bank could sue in district court under Title 12 USC Section 632 since "it was doubtless the intention of Congress to grant full right of recourse to the federal courts to these institutions, which had become important agencies of the federal government in its control of banking and currency." In *Federal Reserve Bank of Boston v. Commissioner of Corporations and Taxation of the Commonwealth of Massachusetts,* 499 F.2d 60 (1st Cir., 1974), the court made certain observations which are highly relevant to the issue at hand:

"Federal reserve banks by contrast are plainly and predominantly fiscal arms of the federal government. Their interests seem indistinguishable from those of the sovereign. . . . There are 12 such banks in the nation, of which plaintiff is one. They were created and are operated in furtherance of the national fiscal policy. They are not operated for the profit of shareholders, and do not provide ordinary commercial banking services; their shareholders, the member banks, lack the powers and rights customarily vested in shareholders of a private corporation. Federal reserve banks act as depositories for money held in the U.S. Treasury and as fiscal and monetary agents of the U.S. 12 U.S.C. Section 391. They hold the legal reserves of member banks, issue currency, facilitate check clearance and collection, and have supervisory duties as to member banks. They also provide important services for the Treasury with respect to the public debt and the issuance, handling and redemption of government securities. The limited income generated is used to pay expenses and dividends limited to 6 percent. Any remaining earnings are paid into the surplus fund, 12 U.S.C. Section 289, where they may be used by the U.S. Treasury to supplement the gold reserve. Should a federal reserve bank go into liquidation, any surplus becomes the property of the U.S., 12 U.S.C. Section 190."

See also, *Brink's Inc. v. Board of Governors of the Federal Reserve System,* 466 F.Supp. 116 (D.C., D.C., 1979).

Aside from the general federal nature of the Federal Reserve Banks, specific authorization by the Federal Reserve Board (which the defendant concedes to be a federal agency) was required for the acquisition and demolition of the Fox Building.

Thus, under the relevant facts, the Court is convinced that a federal agency had either direct or indirect jurisdiction, or both, over the action being complained of herein. See *Edwards, supra,* at 682.

The National Environmental Policy Act ("NEPA") requires, *inter alia,* that

". . . all agencies of the Federal Government shall—

.     .     .     .     .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short–term uses of man's environment and the maintenance and enhancement of long–term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to the environmental impact involved. . . . "

■ It is not disputed that the defendant did not file an environmental impact statement, as would be required if the demoli-

tion of the Fox Building were a "major federal action significantly affecting the quality of the human environment."

The demolition of the Fox Building, in terms of the costs therefor, is not a "major federal action." Less than $25,000 has been approved for the undertaking. It is only in the context of the demolition of a building listed on the National Register of Historic Places that the action may be viewed as a major federal action; but this consideration is interwoven with the requirement that the challenged action must significantly affect the quality of the human environment.

The Fifth Circuit has held that NEPA's threshold requirement is that of a primary impact on the *physical* environment:

"NEPA was enacted in recognition of the effect that man's activities  *  *  *  * have on the "natural Environment." 42 U.S.C. Section 4331. The primary concern was with the physical environmental resources of the nation. (Citing cases). We do not mean to say that socio–economic effects can never be considered under NEPA. When an action will have a primary impact on the national environment, secondary socio–economic effects may also be considered. (Citing cases) But when the threshold requirement of a primary impact on the physical environment is missing, socio–economic effects are insufficient to trigger an agency's obligation to prepare an (environmental impact statement). (Citing cases)." *Image of Gr. San Antonio, Texas v. Brown*, 570 F.2d 517 (5th Cir., 1978).

Plaintiff herein has not adduced any evidence on the impact on the physical environment of the proposed demolition of the Fox Building. It has shown an impact on an architecturally and historically significant building–surely a social concern.

Under the teaching of *Image of San Antonio, supra*, plaintiff has not carried the burden of showing a "major federal action significantly affecting the quality of the human environment." NEPA, then, does not apply under these circumstances.

■ For yet another reason, assuming that the proposed demolition is a "major federal action significantly affecting the quality of the human environment", plaintiff's NEPA claim must be dismissed.

Since 1978 when it acquired the Fox Building, the defendant has planned to demolish it. For almost two years, the plaintiff has had at least constructive notice of an arguable violation of NEPA. Since the defendant commenced buying up the property in Block 61, the local news media has widely reported the suspected efforts by the defendant to buy all the property in the block for the purpose of expansion. A reasonable expectation would be that the expansion would entail a demolition of the existing old and dilapidated buildings in the block. Without any sound reason disclosed by the evidence, plaintiff delayed the bringing of this action until one day prior to the time that the ball of the wrecking crew was scheduled to knock down the building.

In the meantime, the defendant has expended between $1,000,000 to $2,000,000 in acquiring the remaining parcels of property in the block and removing the existing structures therefrom. It has foregone the opportunity of exploring alternate sites for its expansion–either within or outside the City of Birmingham. Actual demolition of the Fox Building has already started. Under these circumstances–an unexcused delay in bringing the action and an undue prejudice to the defendant shown here by the evidence–the law of this circuit is that the doctrine of laches bars relief under NEPA. *Save Our Wetlands v. U.S. Army Corp of Engineers*, 549 F.2d 1021 (5th Cir., 1977); *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Ecology Center v. Coleman*, 515 F.Supp. 860, 867 (5th Cir., 1975); *Clark v. Volpe*, 342 F.Supp. 1324 (E.D.La., 1972), *aff'd* 461 F.2d 1266 (5th Cir., 1972).

■ Under the terms of the National Historic Preservation Act ("NHPA"),

"The head of any federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State .and the head of any

Federal department having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking."

At the time when the defendant received approval for funds with which to demolish the Fox Building, the building was admittedly not on the National Register of Historic Places. The uncontradicted testimony of the Branch Manager of the Birmingham Branch of the defendant is that the funds for the demolition of the building were finally approved in August of 1979. It was one full year later that the building was listed on the National Register.

The question then becomes one of whether the Fox Building was "eligible for inclusion in the National Register" as of August, 1979. Otherwise, under settled authorities, the Act does not apply because the demolition funds had been finally approved prior to the attainment of National Register status by the Fox Building. *Hart v. Denver Urban Renewal Authority*, 551 F.2d 1178 (10th Cir., 1977); *Wisconsin Heritages, Inc. v. Harris*, 460 F.Supp. 1120 (E.D.Wis., 1978); *South Hill Neighborhood Assn. v. Romney*, 421 F.2d 454, 461, 462 (6th Cir., 1969); Cf. *WATCH v. Harris*, 603 F.2d 310 (2d Cir., 1979), cert. denied 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); where NHPA was held applicable to an undertaking for which federal funds had not been "finally" approved.

Under Title 36 C.F.R. Section 800.2 a building is "eligible" for the National Register if it meets the National Register Criteria. "National Register Criteria" include the standards "... established by the Secretary of the Interior to evaluate properties to determine whether they are eligible for inclusion in the National Register", as set forth in Title 36 C.F.R. Section 60.6.

Title 36 C.F.R. Section 60.6 criteria are set forth as follows:

"The quality of significance in American history, architecture, archeology, and culture is present in districts, sites, buildings, structures, and objects of State and local importance that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and

(a) That are associated with events that have made a significant contribution to the broad patterns of our history; or

(b) That are associated with the lives of persons significant in our past; or

(c) That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinquishable entity whose components may lack individual distinction; or

(d) That have yielded, or may be likely to yield, information important in prehistory or history.

Although the Fox Building apparently satisfies one or more of these criteria, no federal agency or state historical commission had so found or determined prior to the approval of funds for its demolition. Indeed, it was several months after the funds had been finally approved that steps were initiated to determine whether the building could be nominated to the National Register. It was not until April of 1980 that the Alabama Historical Commission determined that the building met the National Register criteria. Without such a determination or finding, the building was ineligible for nomination to the Secretary of the Interior for inclusion on the Register.

Since the building had not been determined to be eligible for inclusion on the National Register, and had not in fact been nominated to the Register as of the date on which funds for its demolition were finally approved, NHPA did not apply.

Notwithstanding the inapplicability of NHPA, the defendant took into account the

effect of the proposed demolition after the architectural and historical significance of the Fox Building had been brought to its attention. It considered, and indicated its willingness to consider, various alternatives to the demolition of the building.

■ However, the defendant did not "... afford the Advisory Council on Historic Preservation a reasonable opportunity to comment" with regard to the proposed demolition. This requirement is only a notification requirement, for as Title 36 C.F.R. Section 60.12 suggests

"Having complied with this requirement, the agency may adopt any course of action it may feel appropriate. While the Advisory Council comments must be taken into account and integrated into the decision–making process, the program decision rests with the agency implementing the undertaking."

The defendant had the benefit of comments from local and state historians, elected officials of the government, and the general public when in effect it reconsidered, between September 1979 and August 1980, its earlier decision to demolish the Fox Building. See *D. C. Federation of Civil Assn. v. Adams*, 571 F.2d 1310 (4th Cir., 1978).

The laches doctrine, discussed earlier in connection with the NEPA claim, is equally applicable here. For all that appears, had the plaintiff timely filed this action, the Advisory Council on Historic Preservation would have been afforded, nearly a year ago, a reasonable opportunity to comment on the proposed demolition had this Court found non–compliance by the defendant with the applicable provision of NHPA.

For the above reasons, the temporary restraining order previously entered herein shall be dissolved, and a final judgment by separate order will be entered for the defendant.