Flossie E. LEE, et al., Plaintiffs,

v.

Richard THORNBURGH, et al., Defendants.

Civ. A. No. 89–0421.

United States District Court, District of Columbia.

March 1, 1989.

Andrea Ferster, Harmon, Curran & Tousley, Washington, D.C., for plaintiffs.

Asst. U.S. Attys. Michael Martinez, John Facciola, Washington, D.C., for Federal defendants.

Asst. Corp. Counsel, D.C., Beverly A. Lewis, Correction Litigation Section, Dept. of Corrections, D.C., Washington, D.C., for D.C. defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

In connection with its efforts to build a new community forensic treatment facility (CTF), the District of Columbia is planning to demolish Gallinger Municipal Psychopathic Ward (Gallinger Hospital or Gallinger), a former psychiatric facility built in

1922 that has recently been nominated for inclusion on the National Register of Historic Places. The question before the Court in this case is whether the federal government's involvement in the CTF project constitutes a "Federal or federally assisted undertaking" within the meaning of section 106 of the National Historic Preservation Act (NHPA or Act), 16 U.S.C. §§ 470 *et seq.*, thus triggering the performance of certain mandatory obligations under the Act before Gallinger is destroyed. Having considered the entire record herein, the Court answers that question in the affirmative.

I. The Statutory and Regulatory Background

Proclaiming that "the spirit and direction of the Nation are founded upon and reflected in its historical heritage," Congress enacted the NHPA in 1966 in order to "foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony." 16 U.S.C. §§ 470(b)(1) & 470–1(1). To that end, the Secretary of the Department of Interior is authorized to create a National Register of Historic Places (National Register) composed of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." *Id.* § 470a(a)(1)(A). Sites may be added to the National Register by Act of Congress, by designation of the Secretary, and by nominations of interested persons, local governments and federal agencies. The Secretary has published regulations, contained at 36 C.F.R. Part 60, establishing procedures and criteria to govern the nomination process.

NHPA contains other mechanisms to achieve its goals. The Act permits the creation of State Historic Preservation Programs, which are administered by a State Historic Preservation Officer and regulated by a State Historic Preservation Review Board, to carry out preservation activities and identify and nominate eligible proper-

ties for inclusion in the National Register. *See* 16 U.S.C. § 470a(b).[1] In addition, financial assistance for the preservation of historic structures is available in the form of direct grants to states for historic surveys and plans, *see* 16 U.S.C. § 470c; loan insurance for maintenance of National Register properties, *id.* § 470d; and funding for renovation and restoration projects, *id.* § 470b–1. The Act also establishes the Advisory Council on Historic Preservation (Advisory Council), an independent federal agency entirely devoted to historic preservation through coordination of public and private ventures, education of members of the public and advice to Congress and the President. 16 U.S.C. §§ 470i & 470j.

Finally—and most important for purposes of this case—NHPA also imposes a number of preservation requirements on federal agencies. One of these is contained in section 106 of Act. It provides that, prior to the expenditure of funds for any "Federal or federally assisted undertaking," a federal agency with direct or indirect jurisdiction over the undertaking must (1) take into account the effect of the undertaking on any building or object that is included in or eligible for inclusion in the National Register and (2) provide the Advisory Council with a reasonable opportunity to comment with regard to such undertaking. 16 U.S.C. § 470f. Two additional requirements are contained in section 110 of NHPA for federal agencies that own or control historic properties. Section 110(b) states that, when a historic property is to be substantially altered or demolished, the agency must take timely steps to make "appropriate records" of the property and to deposit those records in the Library of Congress for further use and reference. 16 U.S.C. § 470h–2(b). And section 110(d) compels agencies to carry out their programs and projects "in accordance with the purposes" of the Act. *Id.* § 470h–2(d).

II. The CTF and Gallinger Hospital

In December 1985, Congress appropriated $30 million for the design and construc-

---

**1.** The state programs are responsible, among other things, for implementing a comprehensive statewide historic preservation plan, for disbursing federal funding allocated for state historic preservation efforts, and for preparing a statewide survey of historic properties. *Id.* § 470a(b)(3).

tion of a prison facility within the District of Columbia.[2] After studying several possibilities, Mayor Marion Barry, Jr. formally announced on April 11, 1986 that he had selected a 10.5 acre site on the grounds of the D.C. General Hospital in Southeast Washington, D.C. for construction of a new forensic treatment facility that would house 700–800 prisoners. *See* 33 D.C. Register 2,297 (April 11, 1986). An additional $20 million in funding was authorized in October 1986, *see* Pub.L. 99–591, 100 Stat. 3341–181 (1986), but the Senate Committee on Appropriations imposed a moratorium in September 1987 on the expenditure of any previously-authorized funds until a study of alternative sites, to be conducted by the General Accounting Office, was completed.[3] In May 1988, the Mayor was informed that the moratorium had been lifted and that construction of the CTF could proceed on the site he had selected. Design plans were released to the public on July 26, 1988.

At the heart of this case are three historic properties located on or near the site chosen by the District of Columbia. The first is Congressional Cemetery, a Historic Landmark included in the National Register that is immediately adjacent to the CTF site. Located directly on the CTF land is a prehistoric archeological site eligible for inclusion in the National Register. Gallinger Hospital is also located on the property where the CTF will be built. On December 2, 1988 the Keeper of the National Register, an official within the Department of Interior, ruled that Gallinger was eligible for inclusion in the National Register. *See* Plaintiffs' Exhibit D.[4] In determining that Gallinger was eligible to be nominated because of its local historical and archeological importance, the Keeper noted:

> The four-building complex, constructed between 1920–22 in the Colonial Revival Style advocated by the U.S. Commission of Fine Arts for public buildings in the Nation's capital, is associated with the important early 20th century movement which modernized the treatment of the mentally ill. The ward, reflecting the most modern medical opinion of the 1920s, was constructed as a "home pavilion" facility with individual short term care for the mentally ill. Designed by the Municipal Architect in 1919 and constructed under the control of the District of Columbia's Board of Charities, the psychopathic ward reflects the movement to coordinate the Federal government's subsidy of the local system of charitable aid and medical services to the indigent. [Gallinger] was an early and important component of the larger health care facility that developed into the District of Columbia General Hospital. Its construction and history of health care

---

**2.** Section 101(c) of Public Law 99–190 made available "[s]uch amounts as may be necessary for programs, projects, or activities provided for in the District of Columbia Appropriations Act, 1986 (H.R. 3067), to the extent and in the manner provided for in the conference report and joint explanatory statement of the committee of conference." *See* 99 Stat. 1185, 1224 (Dec. 19, 1985). The Conference Report provided for $30 million in funds but made its appropriation contingent on approval by Congress of plans for the design and construction of the new facility. *See* H.Conf.Rep. 419, 99th Cong., 1st Sess. 3, 4 (1985).

**3.** *See* Pub.L. 100–202, 101 Stat. 1329, 1329–91 (1987).

**4.** The path to this result was a rocky one, however. On April 18, 1988, a District of Columbia Advisory Neighborhood Commission (ANC) submitted an application to have Gallinger nominated to the National Register. When the State Preservation Review Board denied that request, an appeal was filed with the Department of Interior pursuant to 36 C.F.R. § 60.12. In September 1988 a lawsuit was filed in the Superior Court of the District of Columbia asking that the ANC's application be reinstated and seeking to enjoin demolition of Gallinger. The case was settled soon thereafter, when the defendants agreed to reinstate the application, hold a new hearing on the Gallinger application, and refrain from demolition while the application was pending. (The suit also challenged a decision by the Review Board refusing to list Gallinger on the District of Columbia's Inventory of Historic Sites. *See* D.C.Code § 5–1003(c)(3). The settlement included an agreement to reconsider this request as well).

After holding a hearing on October 27, 1988, the Review Board stated that it would adhere to its prior decision refusing to nominate Gallinger to the National Register. The ANC appealed once again to the Keeper, who rendered his decision on December 2, 1988.

provided to the mentally ill reflects the humane impulses of the Progressive Era reforms and was a significant advance for the District of Columbia in the areas of health and medicine, social history, and architecture.

*Id.* After this decision was issued, the District of Columbia's State Historic Preservation Officer nominated Gallinger for inclusion on the National Register on January 13, 1989, *see* Plaintiffs' Exhibit E, and the Keeper published a notice in the Federal Register to that effect on February 7, 1989. *See* 54 Fed.Reg. 6,036, 6,037 (1989).[5]

### III. The Instant Case

Plaintiffs are several individuals who reside in the neighborhood adjacent to the site chosen for the CTF and three unincorporated associations committed to historic preservation of the area. They filed this action on February 16, 1989 against Attorney General Richard Thornburgh, Secretary of the Interior Manuel Lujan, Jr., the District of Columbia, its Mayor, Marion Barry, Jr., and John Touchstone, Director of the District of Columbia's Department of Public Works.[6] The complaint alleges that defendants violated section 106 of NHPA by failing to take into account the effects of the CTF on the three historical properties at the CTF site and by failing to provide the Advisory Council with an opportunity to comment on the project; violated section 110(d) of the Act by failing to

carry out the CTF project in a manner consistent with the statute; and violated section 110(b) of NHPA by failing to gather appropriate records prior to the demolition of Gallinger.[7] In addition to declaratory relief, plaintiffs sought an injunction that would preclude defendants from taking any actions that would have any adverse affects on the three historic properties until after all of the requirements of NHPA have been complied with. Complaint at 18–19.[8]

Simultaneously with the filing of their complaint, plaintiffs filed a motion for a temporary restraining order and a preliminary injunction. The Court held a scheduling conference that same date and, because of the important issues involved and imminent demolition of Gallinger,[9] urged the parties to proceed promptly to a final disposition on the merits. Although this proposal was originally unacceptable to the District of Columbia, *see* February 21, 1989 Order, all of the parties subsequently agreed at the hearing held on February 24, 1989 that this Court's decision would serve as the final disposition of this case.

### IV. Discussion

Resolution of this case turns on the question whether the proposed demolition of Gallinger Hospital is governed by section 106 of NHPA. That section provides:

> The head of any Federal agency having direct or indirect jurisdiction over a pro-

---

**5.** A 15–day waiting period after notice of nomination is given to allow for comments by interested parties. *See* 36 C.F.R. § 60.13(a). At oral argument, plaintiffs' counsel indicated that Gallinger would be formally placed on the National Register "any day now."

**6.** All of the individual defendants are named in their official capacity. For convenience, the Court will refer to Attorney General Thornburgh and Secretary Lujan as "the federal defendants" and to the local defendants as "the District of Columbia" unless otherwise noted.

**7.** Plaintiffs also maintain that these omissions violate Executive Order No. 11,593, which imposes requirements nearly identical to those contained in sections 110(b) and 110(d) of the statute. *See* 36 Fed.Reg. 8,921 (1971).

**8.** On February 16, 1989, plaintiffs filed Civil Action No. 89–1715 in the Superior Court of the District of Columbia challenging the failure of

the Review Board to list Gallinger on the District of Columbia's Inventory of Historic places after the Keeper had ruled that Gallinger was eligible for the National Register. *See supra* note 4. That action, however, names only local defendants and asserts causes of action under District of Columbia law and is therefore not relevant to the instant case. The Superior Court complaint, which has been filed in the record in this action, formed the basis for the discussion of the background of the ANC's efforts at nominating Gallinger described in note 4.

**9.** Counsel for the District of Columbia indicated at the scheduling conference that asbestos removal is already underway and would last another two weeks, at which time demolition of Gallinger would begin. He stated that no structural damage would take place in the interim, however.

posed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council ... a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f. The mandates of section 106 are not onerous. As the Fifth Circuit has noted, this provision "neither ... forbid[s] the destruction of historic sites nor ... command[s] their preservation." *United States v. 162.20 Acres of Land,* 639 F.2d 299, 302 (5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). At the same time, section 106 is not a "serpent without fangs as to federal planners bent on disregard of its mandate." *Id.* at 304. Because "the language is mandatory," section 106 "order[s] the government to take into account the effect any federal undertaking might have on [historic properties]." *Id.* at 302. Under applicable regulations issued by the Advisory Council, a federal agency must first make "a reasonable and good faith effort" to identify any historic properties that could be affected by its undertaking. *See* 36 C.F.R. § 800.4(b). If none are found, or if a property is discovered but the agency concludes that no effects will occur, the agency's obligations are completed and the review process is at an end. *Id.* §§ 800.4(d) & 800.5(b). If an effect is found but is determined by the agency not to be adverse and the Advisory Council does not object, the process again comes to an end. *Id.* § 800.5(d). If an adverse effect is projected, or if the Advisory Council objects to the Agency's finding of no adverse effect, the

agency is required to consult with the State Historic Preservation Officer to seek ways to avoid or reduce the effects on the property; the Advisory Council is also permitted to participate in the consultation. *Id.* § 800.5(e). Ultimately, however, the agency head is free to terminate the consultation process and proceed with the undertaking. *Id.* § 800.5(e)(6); *see also* 36 C.F.R. § 60.2(a).

Although the District of Columbia has been aware of the potential applicability of section 106 since September 1987 and the Departments of Justice and Interior since September 1988,[10] the section 106 procedures have not been performed in connection with the CTF site. No review was done, according to defendants, because the CTF project is not an "undertaking" within the meaning of the statute.

As noted above, section 106 only applies to "a Federal or federally assisted undertaking." The Act, in a feat of non-definition, describes the term "undertaking" as "any action described in section [160]." 16 U.S.C. § 470w(7). A regulation promulgated by the Advisory Council, which has been cited by all the parties, provides additional guidance:

"Undertaking" means any project, activity, or program that can result in changes in the character or use of historic properties, if any such historic properties are located in the area of potential effects. The project, activity, or program must be under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency. Undertakings include new and continuing projects, activities, or programs and any of their elements not previously considered under section 106.

36 C.F.R. § 800.2(o). A project or activity may therefore qualify as an "undertaking" in one of three ways: it can be either "under the direct or indirect jurisdiction" of, "licensed by," or "assisted by" a federal agency. The defendants do not dispute

---

**10.** The Advisory Council initiated an inquiry into the CTF project by writing letters to the federal agencies and the District of Columbia's Department of Public Works that specifically

mentioned the applicability of section 106 and sought additional information about the federal government's role in the CTF project. *See* Plaintiffs' Exhibits I & J.

that the federal government has been involved, to some extent, with plans for the CTF.[11] They contend, however, that the involvement does not rise to the level of an "undertaking." Several factors lead the Court to conclude otherwise.

■ 1. Funding. Several courts confronted with the "undertaking" determination have stressed the importance of the source of funding for the project or activity involved and have refused to find a violation of section 106 in the absence of federal financial support. *See, e.g., Ringsred v. Duluth,* 828 F.2d 1305, 138 (8th Cir.1987) ("[t]he federal government provides no financial aid to the project"); *Edwards v. First Bank of Dundee,* 534 F.2d 1242, 1245 (7th Cir.1976) ("proposed demolition "is not federally funded ... in any respect").[12] In the instant case, however, the monies that the District of Columbia is using to construct the CTF have come from the federal government in the form of direct appropriations from Congress that were specifically earmarked for a new prison and expressly conditioned on Congressional approval of the site chosen. *See supra* at 601 & nn. 2–3. The use of federal monies for the design and construction of the CTF points strongly towards the presence of an "undertaking" under section 106.

Despite the federal funds involved, defendants argue that no "undertaking" exists here. The federal defendants, for example, contend that "a prerequisite for application of the NHPA" is the distribution of funds by a federal agency. Asserting that the monies for the CTF "were appropriated directly by Congress and not through or under the control of any federal agency," they maintain that section 106 is not implicated by the Congressional funding provided. *See* Federal Defendants' Opposition at 14–15; District of Columbia Opposition at 5–6.

Both the major and minor premises of this clever syllogism are erroneous, however. For one thing, the language of section 106 does not contain the threshold limitation advanced by defendants. Although a federal agency must have "direct or indirect jurisdiction over" or "authority to license" a project or activity, the statute does *not* state that funds for a project must come from, or be distributed by, a federal agency to trigger section 106. Rather, the Act speaks only of the "expenditure of *any* Federal funds" (emphasis added). This broad language clearly refutes defendants' claim. In addition, however, defendants' position would produce results that are irreconcilable with the intent and spirit of the legislation. Because of the District of Columbia's unique budgetary status—in which the great majority of revenue is appropriated directly from Congress and not from any federal agency, acceptance of the defendants' argument would likely insulate most projects and activities in the District of Columbia from section 106 review. Such a wholesale exception to the requirements of NHPA is neither present in the statute nor consistent with the Act's preservation-related goals.[13] Defendants' argument must be rejected.

Moreover, defendants' suggestion that the funds for the CTF project were generated without federal agency involvement is simply untenable. In recent litigation involving the District of Columbia's refusal to accept new prisoners into its Department of Corrections, the United States took a very different position than the one it presently espouses. In a brief discussing

**11.** *See* Federal Defendants' Opposition at 13 ("the federal government's involvement ... was, at best, minimal"). Counsel for the District of Columbia conceded at the February 24, 1989 hearing that the federal government's involvement was "a type of assistance," but also characterized that assistance as "minimal."

**12.** *Ringsred,* a case relied on by the federal defendants, arose under both NHPA and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. The court noted that NHPA's

"undertaking" language was similar to NEPA's "major federal action" requirement and analyzed both claims in accordance with caselaw construing the latter. 828 F.2d at 1308–09. *See also 162.20 Acres of Land,* 639 F.2d at 304 n. 5.

**13.** And in an era of increased block grants from Congress to the states, defendants' contention could well surgically remove other areas, such as transportation projects or public housing, from the dictates of section 106.

federal assistance to help alleviate the prison situation in the District of Columbia, it stated that "[t]he Attorney General persuaded first the office of Management and Budget and then Congress to obtain the funding Congress appropriated for new prison facilities for the District." [14] That statement is also borne out by materials in the record in the instant case. In 1985, for example, the Chairman of the District of Columbia Subcommittee of the Senate Appropriations Committee related a conversation he had with then-Attorney General Meese about the District of Columbia's prison problem:

> [A]lthough he [Meese] was not prepared to agree to broader proposals which I had demanded, he did agree that the District of Columbia was a special federal responsibility, and he would be willing, as I say, to work on a cooperative basis with you, Mr. Mayor, the Congress, and this subcommittee.
>
> He expressed a word of caution that the matter would have to be submitted through appropriate channels, through the Office of Management and Budget, and the exact formula would have to be determined.

Plaintiffs' Exhibit O at 212. Appearing before the House Committee on the District of Columbia in 1986, then-United States Attorney for the District of Columbia Joseph DiGenova stated:

> I personally was the one who asked for the money from the Federal Government for the prison. Any other State in the Union would have been just delighted at the prospect of a government official requesting money to build a prison and then having the initial funds turned over.

Plaintiffs' Exhibit P at 279. The involvement of these federal officials in the CTF funding process demonstrates that the monies for the project did not emerge spontaneously from Congress in a burst of largesse but rather were directly solicited by the Department of Justice. The Court therefore finds that the use of federal funds to construct the CTF, obtained through the direct assistance of officials of the Department of Justice, indicates an "undertaking" within the meaning of section 106.[15]

2. Land. In *Ringsred,* the court refused to find an "undertaking" based, in part, on the fact that land on which a proposed parking ramp was to be built was owned by a city and not the federal government. 828 F.2d at 1308. Here, however, the land on which the proposed CTF will be built is owned by the United States, not the District of Columbia. Although they do not dispute that title to the land rests in the United States, the federal defendants maintain—without citation—that "that fact is insignificant here" because grant of a license for a project, and not ownership of land, triggers application of section 106. Opposition at 16. Contrary to the federal defendants' assertion, however, a license grant is not the sole means by which section 106 review can apply. As noted above, an "undertaking" exists when the project is "under the direct or indirect jurisdiction of," "licensed by," or "assisted by" a federal agency. 36 C.F.R. § 800.2(*o*). And while ownership of land is not dispositive of the question whether an undertaking exists, it certainly is one, not-insignificant factor to be considered in the equation. *See Ringsred.* Accordingly, the federal ownership of the CTF land further indicates a section 106 "undertaking."

**14.** *See United States of America v. District of Columbia, et al.,* 703 F.Supp. 982 (D.D.C.1988) Memorandum in Support of Motion for a Temporary Restraining Order at 8.

**15.** Citing *Hart v. Denver Urban Renewal Authority,* 551 F.2d 1178 (10th Cir.1977), and *Committee to Save the Fox Building v. Birmingham Branch of the Federal Reserve,* 497 F.Supp. 504 (N.D.Ala.1980), the District of Columbia contends that, because funds for the CTF were authorized before Gallinger was included on the

National Register, NHPA does not apply. Opposition at 7–8. As plaintiffs correctly observe, *see* Reply Brief at 6–7, those cases construed an earlier version of section 106 which only applied to property "included in" the National Register. Since that time, the statute has been amended and applies to property "included in or eligible for inclusion in" the National Register. And in *Boyd v. Roland,* 789 F.2d 347 (5th Cir.1986), the Fifth Circuit overruled *Committee to Save the Fox Building.*

3. Clearance of the Site. In 1890 jurisdiction over the CTF site was transferred to the District of Columbia "for the purpose of the burial of the indigent dead of the District of Columbia." D.C.Code § 8–135. *See* Act of August 6, 1890, 26 Stat. 306, ch. 724. Without express federal approval of plans to construct a new prison on the site, this restricted use would have prevented the District of Columbia from placing the CTF at its present location. Where, as here, federal action is "a legal condition precedent" to the construction of the project, an additional indication of an "undertaking" exists. *Ringsred*, 828 F.2d at 1308.

Defendants counter in two ways. They first assert that the federal government had no role in the selection of the site for the CTF, which was chosen by Mayor Barry from among several alternatives. But defendants ignore that *approval* for use of the site was necessary, was sought by the Mayor and was granted by the United States Department of Justice after it consulted with other agencies. In describing the selection of the current site for the CTF to Congress in 1986, Deputy Attorney General D. Lowell Jensen stated:

> The Mayor's representatives then contacted us *to solicit our agreement* to use of a new site south of the present D.C. Jail as a location for construction of a new prison. *We quickly cleared that site with the Department of Interior and the General Services Administration, and advised the Mayor's representative that it was acceptable.*

Plaintiffs' Exhibit A at 13 (emphasis added). And prior to the selection of the current CTF site, the District of Columbia also requested similar approval from the Department of Justice for three other locations that had been under consideration.[16] Thus, regardless of the fact that it was the Mayor who selected the site, it is clear that the prison could not have been built had the federal government not first approved the use of the land.

In a rather remarkable argument, the federal defendants also maintain that the District of Columbia *could* have used the land for the new facility without first obtaining federal approval. This generous stance must be rejected for several reasons. The most important is that the authority they rely on, *United States v. District of Columbia*, 788 F.2d 239 (4th Cir. 1986), is inapposite to the present case.[17] Moreover, the federal defendants' present posture is completely at odds with the view they took at an earlier stage in the site-selection process.[18] Finally, any reliance on what hypothetically might have been done is irrelevant in light of the repeated requests by the District of Columbia for approval of various tracts of federal land (including the one ultimately selected) on

---

**16.** *See* Plaintiffs' Exhibit A at 12 ("I directed my staff to immediately discuss these sites with the affected agencies and see whether they could be made available"); *see also* Plaintiffs' Exhibit N. The brief submitted by the United States to the Court in *United States of America v. District of Columbia et al.*, 703 F.Supp. 982 (D.D.C.1988), also makes this point ("When the Mayor insisted that land for a new prison would have to come from the federal government, the Attorney General found federal sites within the District of Columbia. Within days, after consultation with appropriate federal agencies, the Attorney General identified three sites to be made available").

**17.** In the case cited, the United States brought an ejection action with respect to a piece of land that was titled in the United States but in the possession of the District of Columbia. The United States claimed that, because Congress had authorized the District of Columbia to acquire the land to build a tuberculosis sanatorium, it could not thereafter lease the proper-

ty when the hospital ceased operations. The Fourth Circuit disagreed and rejected the ejectment action. There are, however, critical differences between that case and this one. The District of Columbia had acquired the land (which was located in Maryland) with its own funds, thereby acquiring an equitable interest in the land. 788 F.2d at 240. In addition, the Fourth Circuit relied heavily on the fact that Congress had also passed a law specifically granting the Mayor the right to lease any land under his control. 788 F.2d at 241. Neither circumstance obtains here.

**18.** When the District of Columbia stated that it sought to use the "old D.C. Jail" site for expansion of the D.C. General Hospital, the Department of Justice asserted that "no authorization has been granted by the United States to use this land for expansion of D.C. General Hospital, or for any purpose other than a jail." Plaintiffs' Exhibit N at 1.

which the CTF could be built as well as the grant of those requests by agencies of the United States. The necessity for federal clearance was understood by all and federal clearance was in fact given, providing an added indicia of a section 106 "undertaking."

4. *Summary.* The CTF proposed by the District of Columbia is being financed with federal monies, is situated on land owned by the federal government, and could be built only with prior approval of the federal government. Defendants correctly observe that the design and construction of the facility is entirely a determination of the Mayor. Yet that is virtually the *only* aspect of the project to which the federal government has not been a party and does not overcome the considerable federal involvement and assistance described above. Accordingly, the Court concludes that the construction of the CTF is a "federally assisted undertaking"[19] and that section 106 has been violated because the procedures set forth in the statute and regulations have not been complied with.[20]

## V. Countervailing Considerations

■ 1. The federal defendants maintain that injunctive relief is unwarranted because it would compel them to perform a useless act. They argue that, even were a section 106 review conducted and the District of Columbia compelled to take some action with respect to Gallinger to alleviate adverse effects upon it, the federal government could not condition the use of the funds appropriated by Congress on the performance of that act. Opposition at 15–16. But it is clear that NHPA must be applied "as long as a Federal agency has opportunity to exercise authority at any stage of an undertaking where alterations might be made to modify its impact on historic preservation goals." *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 280 (3d Cir.1983). *See also WATCH v. Harris,* 603 F.2d 310 (2d Cir.), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979). As plaintiffs point out in their reply brief, the federal government could exercise authority at this stage of the CTF project by, for example, withdrawing the clearance it provided for use of the CTF as a prison until the mandates of the section 106 process have been effectuated. Because (prior to the Department of Justice's clearance of the CTF site) the land had been designated for use as a burial ground, *see supra* at 607, withdrawal of federal clearance would guarantee meaningful section 106 review prior to continued construction of the CTF. This argument therefore lacks merit.

■ 2. Defendants also advance a more general but compelling equitable argument. An injunction preventing the demolition of Gallinger and mandating a section 106 review would, they contend, delay construction of the CTF, exacerbate the District of Columbia's present prison crisis, and ultimately increase the cost of the

---

**19.** At oral argument, the federal defendants vigorously asserted that an "undertaking" could only result when a federal agency exerts "control" over a project. This position is totally flawed. It ignores the plain language of the statute, which uses the term "federally assisted undertaking." It is contrary to the Advisory Council regulations cited by defendants, which define an "undertaking" as a program "assisted by a Federal agency." And it finds absolutely *no* support in the caselaw, which has construed section 106 much more broadly than the cramped reading which defendants urge upon the Court. *See, e.g., 162.20 Acres of Land,* 639 F.2d at 302 ("the language is mandatory and the scope is broad"); *WATCH v. Harris,* 603 F.2d 310, 326 (2d Cir.), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979) (noting that "the mandate of NHPA ... is quite broad" and refusing to adopt a "crabbed interpretation" of

section 106); *Ely v. Velde,* 451 F.2d 1130, 1137–38 n. 22 (4th Cir.1971) (federal "promotion and planning" sufficient to trigger NHPA and NEPA); *Techworld Development Corp. v. D.C. Preservation League,* 648 F.Supp. 106, 120 (D.D. C.1986) ("undertaking" exists when agency's involvement in a project concerns "its initiation, its funding or its authorization").

**20.** Moreover, defendants have completely failed to address, and thus must be assumed to have conceded, plaintiffs' additional claims that they did not make "appropriate records" of Gallinger prior to its demolition or carry out their programs "in accordance with the purposes" of NHPA. These requirements are imposed by sections 110(b) and (d) of the Act, *see* 16 U.S.C. §§ 470h–2(b) & (d), and by Executive Order 11,593, *see* 36 Fed.Reg. 8,921 (1971).

project. They maintain that these important public concerns counsel against the entry of injunctive relief in this case.

The chronic and relentless prison overcrowding difficulties that have beset the District of Columbia for almost two decades have been carefully chronicled by several of the trial and appellate judges of this Circuit, beginning with Judge Bryant's opinion in *Campbell v. McGruder*, 416 F.Supp. 111 (D.D.C.1976), continuing through Judge June Green's decision in *Twelve John Does v. District of Columbia*, No. 80–2136 (August 1, 1988) [1988 WL 83163] (which was affirmed by the court of appeals in an opinion by Judge Mikva, *see Twelve John Does v. District of Columbia*, 861 F.2d 295 (D.C.Cir.1988)), and culminating most recently in Judge Hogan's ruling in *United States of America v. District of Columbia*. Every judge of this Court regularly confronts the plight of this city's prisons and prisoners and the palpable effects on those incarcerated and the community at large. The concerns articulated by defendants exist and are extraordinarily serious. Nevertheless, defendants fail to observe several other important considerations that exist in the instant case.

As the court noted in *Boston Waterfront Residents Association, Inc. v. Romney*, 343 F.Supp. 89, 91 (D.Mass.1972), "[t]he act of demolition is irrevocable. Consideration of alternative plans which might include the preservation and rehabilitation of the present structures is permanently foreclosed once they have been razed." Denial of injunctive relief would allow the District of Columbia to proceed with the imminent demolition of Gallinger Hospital. No amount of money damages and no form of declaratory relief can replace that building once it is gone. The defendants can not and do not suggest otherwise.[21]

Moreover, while an injunction in this case would briefly delay construction of the CTF, that harm is not as monumental as defendants contend. For one thing, the delay in construction of new prison facilities was not caused by plaintiffs but is, in the words of the federal defendants, directly attributable to "the sorry history of the District's abnegation of its responsibility imposed on it by Congress to house its own prisoners and of its refusal and inability to take the necessary steps to house its prisons [sic]." Opposition at 5. Given that well-known history, and in consideration that the District of Columbia has been aware of the potential for section 106 review since September *1987, see supra* note 10, it would be unfair to attribute to plaintiffs the blame for delays and costs overruns on this project. Moreover, the section 106 process need not be lengthy: only three historical sites have been identified and the Advisory Council is already studying the project. *See supra* note 10.[22]

It is also important to emphasize that granting plaintiffs the relief that they seek will not prevent the CTF from ever being built. As noted above, after section 106 procedures have been complied with, a federal agency is free to proceed with its "undertaking" even if adverse effects on the property are found. Since section 106 "neither ... forbid[s] the destruction of historic sites nor ... command[s] their preservation," *162.20 Acres of Land*, 639 F.2d at 302, *plaintiffs* cannot use the vehicle of NHPA to prevent the ultimate construction of the CTF. Before the facility is constructed, however, defendants must take into account the effects of the project on the three historical properties located at

**21.** Although they do not contest irreparability, the federal defendants have attempted to belittle the historic value of the property. *See* Opposition at 19. That attempt, however, is contradicted by the Keeper's determination that Gallinger should be included in the National Register and by the District of Columbia State Historic Preservation Officer's nomination of Gallinger to the National Register as recently as January 1989.

**22.** Because only 14% of the construction work has been completed, *see* District of Columbia Opposition at 9, and because the project is not slated for completion until April 1991, *see* Federal Defendants' Exhibit C at 7, the CTF is clearly not now available as a solution to the short-term housing problem that presently exists for District of Columbia offenders. A relatively brief delay in construction of the CTF will therefore not seriously impact on the short-term crisis either.

the site. In this regard, it is important to note that the defendants themselves possess the means to implement the section 106 review process. A direct correlation exists between the vigor and speed with which they comply with the statutory mandate and the point at which construction of the CTF can resume.

Finally, although their desire to proceed with the CTF and their frustration with this lawsuit is certainly understandable, defendants have not complied with the requirements of a statute passed by the Congress and, more significantly, they have not offered an acceptable explanation for their failure to do so. NHPA was enacted, however, to strike "a meaningful balance ... between preservation of the[ ] important elements of our heritage and new construction to meet the need of our ever-growing communities and cities." H.Rep. 1916, 89th Cong., 2d Sess. 7 (1966). Cavalier disregard for those procedures, or a judicial determination that they should be foregone, would impermissibly tilt the balance created by Congress and would ill-serve the critical goals codified in the Act. Even for so important a public project as construction of a new jail, government frustration cannot be permitted to trump requirements contained in the law.

## VI.  Relief

For the reasons set forth above, the plaintiffs are entitled to the declaratory and injunctive relief that they seek. Although this relief will be granted and this case dismissed, plaintiffs also have requested attorney's fees and costs. *See* Complaint at 19. This matter can be and customarily is briefed subsequently to the decision on the merits. Accordingly, briefing is temporarily deferred to afford the parties an opportunity to amicably resolve this issue. If an agreement is not reached, the parties shall submit briefs in accordance with the schedule set forth in the accompanying Order.

A separate Order accompanies this Memorandum Opinion.

## ORDER

In consideration of the Memorandum Opinion issued this date, it is

DECLARED that defendants have failed to comply with the obligations and duties imposed by sections 106, 110(b) and 110(d) of the National Historic Preservation Act and Executive Order 11,593 prior to the expenditure of funds for the construction of the District of Columbia's community treatment facility;  it is

ORDERED that the defendants, Attorney General Richard Thornburgh, Secretary of Interior Manuel Lujan, Jr., the District of Columbia, Mayor Marion Barry, Jr., and Director of the District of Columbia's Department of Public Works John Touchstone, and all of their agents, are hereby enjoined from taking any action that may adversely affect Gallinger Municipal Psychopathic Ward (Gallinger Hospital), the prehistoric archaeological site, and the Congressional Cemetery, unless and until the defendants have fully complied with the requirements of sections 106, 110(b) and 110(d) of the National Historic Preservation Act and Executive Order 11,593;  it is

FURTHER ORDERED that, in consideration of the immediacy of the matters hereby enjoined and for the reasons stated in the Memorandum Opinion granting this injunction, there shall be no stay of this Order in the event that defendants elect to note an appeal;  it is

FURTHER ORDERED that plaintiffs shall file their application for attorney's fees and costs on or before April 3, 1989; opposition shall be filed by April 24, 1989; reply, if any, is due by May 1, 1989. Should there be a timely appeal, this separate order as to fees and costs shall be stayed until the United States Court of Appeals for the District of Columbia has issued its final ruling in this case;  and it is

FURTHER ORDERED that this action be and it hereby is dismissed.